575 A.2d 944

**Ralph M. HERSHBERGER, Jr., Appellant,**

v.

**JERSEY SHORE STEEL COMPANY and The Williamsport Hospital and Medical Center, Appellees.**

Superior Court of Pennsylvania.

Argued March 8, 1990.

Filed May 29, 1990.

364

Mark F. Lovecchio, Williamsport, for appellant.

Raymond E. Ginn, Jr., Wellsboro, for Williamsport Hosp., appellee.

Joseph Orso, Williamsport, for Jersey Shore Steel, appellee.

Before WIEAND, TAMILIA and POPOVICH, JJ.

POPOVICH, Judge:

This case involves an appeal from the judgment of the Court of Common Pleas of Lycoming County entered in favor of the appellees/defendants, Jersey Shore Steel Company and Williamsport Hospital and Medical Center, and against the appellant/plaintiff, Ralph M. Hershberger, Jr. We affirm in a case of first impression.

The evidence, viewed in a light most favorable to the verdict-winner, reveals that in October of 1986, the plaintiff, because of the relatives he had working at Jersey Shore Steel Company, secured an application, an interview and ultimate employment with the steel company by September 2, 1986.

The plaintiff, as a new employee, was placed on 60 days probation and was required to submit and pass blood and urine tests for alcohol and drug use. In compliance therewith, the plaintiff, on September 4, 1986, went to Jersey Shore Hospital for a chest x-ray and to give a urine sample for drug testing. The urine sample, under an agreement with Jersey Shore Steel Company, was transferred to Williamsport Hospital since it had the facilities to perform the test ("Industrial Drug Screen B") desired by the steel company (for marijuana, alcohol and opiates), and established by its registered nurse in January of 1986 with Williamsport Hospital for its pre-employment applicants for "safety" purposes.

The plaintiff's urine was tested by hospital personnel with the use of the Syva EMIT ST procedure, and it proved to be "positive" for cannabinoids ("marijuana"). The test was repeated to check its accuracy. Again, the reading was "positive". The results were communicated by phone to Jersey Shore Steel Company. In turn, the plaintiff was instructed to meet with the personnel director on September 17, 1986. At this meeting, the president of the company was present with the personnel director when the plaintiff was informed of his drug test results. To this the plaintiff answered: "It couldn't still be in my system" because it had been years since he had used it.

The plaintiff was advised it would be best if he were to resign, and, failing this, he would be fired. The plaintiff resigned, and, approximately one hour later, returned to the mill to ask the personnel director if he could take another test. He was told that the company considered him to have resigned. It would not alter its position.

Nonetheless, the plaintiff, on September 18, 1986, gave blood and urine samples to Jersey Shore Hospital, knowing that it would forward them to Williamsport Hospital for testing. On September 19, 1986, the plaintiff went to Williamsport Hospital to obtain a copy of his September 4th test and the September 18th test as well.

The September 18th test came back "negative" for cannabinoids. Also, the plaintiff was told by the person who performed the tests (a Ronald Hearton) that there still was a sample of his September 4th urine on hand, and it could be analyzed by a "more reliable" test known as gas chromatography mass spectrometry (GC/MS) and performed by National Medical Center Laboratory in Willowgrove, Pennsylvania. The plaintiff agreed to pay for the cost of having the September 4th specimen tested. The result came to him via Williamsport Hospital and indicated a "negative" detection for marijuana metabolites. The same result occurred with the plaintiff's blood sample given to the hospital on September 18th.

With the three negative test results in hand, the plaintiff obtained a meeting with the personnel director and president of Jersey Shore Steel Company on October 6, 1986. Despite the results of the new tests, the plaintiff was told that the company considered him to have resigned his job. However, he was told that if he were able to secure from Williamsport Hospital a document evidencing that it had done something wrong in the testing process, "maybe down the road when they hired there was a possibility [the plaintiff] would be considered along with any other applicant."

On January 27, 1987, the plaintiff reacted to the steel company's refusal to rehire him with the filing of a five-count complaint alleging (1) the intentional infliction of emotional distress, (2) defamation of character, and (3) invasion of privacy against each of the defendants, while (4) wrongful discharge and (5) negligence were asserted against Jersey Shore Steel Company and Williamsport Hospital, respectively.

Prior to trial, Williamsport Hospital filed preliminary objections in the nature of a demurrer and a motion to strike various counts. The Jersey Shore Steel Company, however, merely filed a reply with new matter. The pre-trial court granted Williamsport Hospital's demurrer to the defamation averment in count III of the plaintiff's complaint, while allowing the plaintiff the opportunity to amend the balance of his complaint rather than grant the remaining demurrer/motion to strike.

After the presentment of an amended complaint and answer thereto, interrogatories were submitted and the case was listed for trial. The only counts which remained for the jury to consider after the three-day trial concerned negligence and defamation. The remaining counts were non-suited by the trial court on motions of the defendants' counsel.

As part of the trial court's charge to the jury, five interrogatories were posed for the jury's response and were answered as follows:

1. Were there cannabinoid metabolytes [sic] present in the Plaintiff's 9/4/86 urine sample, inferring marijuana usage by him within the past 75 days?

Yes _X_ No ___ .

2. A. Was the Defendant The Williamsport Hospital and Medical Center negligent?

Yes ___ No _X_ .

B. If Yes, was such negligence a substantial factor in causing damages to the Plaintiff?

Yes ___ No _X_ .

3. Did the Defendant Jersey Shore Steel Company communicate the information relating to the dismissal of Plaintiff as an employee *for a purpose* other than the employer's interest in maintaining a safe plant by dismissing probationary employees reasonably believed to have used marijuana?

Yes ___ No _X_ .

4. Did the Defendant Jersey Shore Steel Company communicate information relating to the dismissal of Plaintiff as an employee *to any person* not reasonably believed by the employer to be necessary to accomplish its purpose of dismissing probationary employees reasonably believed to have used marijuana?

Yes ___ No _X_.

5. In communicating, or continuing to communicate information relating to the dismissal of Plaintiff as an employee, did Defendant Jersey Shore Steel Company act with a reckless or negligent disregard as to its truth or falsity?

Yes ___ No _X_.

With the entry of a verdict in favor of the defendant, the plaintiff filed post-trial motions. These were denied and judgment was entered in favor of the defendants and against the plaintiff. The present appeal was perfected and raises three questions for our consideration. The first challenges, as error, the trial court's refusal to remove the non-suit of wrongful discharge in favor of Jersey Shore Steel Company.

■ In making our determination to uphold the trial court's action, we begin with the understanding that in Pennsylvania an at-will employment environment is the norm, absent a contract to the contrary, and, thus, an employee can be terminated for good reason, bad reason, or no reason at all. *Henry v. Pittsburgh & Lake Erie Railroad Co.*, 139 Pa. 289, 21 A. 157 (1891). Stated otherwise, there is no common law cause of action against an employer for termination of an at-will employment relationship. *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974). "Exceptions to this rule have been recognized in only the most limited of circumstances, where discharges of at-will employees would threaten clear mandates of public policy." *Clay v. Advanced Computer Application*, 522 Pa. 86, 89, 559 A.2d 917, 918 (1989). This position was confirmed recently by our Supreme Court in *Paul v. Lankenau Hospital*, 524 Pa. 90, 569 A.2d 346 (1990), wherein it

reversed Superior Court's equitable estoppel ruling in favor of the plaintiff/appellee on the following grounds:

... "this Court did not announce a cause of action for wrongful discharge in *Geary*. Indeed the language in *Geary* clearly states that a cause of action for wrongful discharge in an at-will employment relationship does not exist."

The *Geary-Clay* analysis is dispositive of the instant case. The doctrine of equitable estoppel is not an exception to the employment at-will doctrine. An employee may be discharged with our [sic] without cause, and our law does not prohibit firing an employee for relying on an employer's promise. In the absence of a legally cognizable cause of action, the trial court erred in submitting the issue to the jury.

524 Pa. at ——, 569 A.2d at 348–49 (Citation omitted).

Instantly, the plaintiff argues that a public policy exists in this country in general and in Pennsylvania in particular against the use of drug testing which proves "positive", and is not confirmed by another distinctive test different from the initial one where one's job hangs in the balance. In support of this claim, the plaintiff points to two pieces of legislation pending in this Commonwealth (Senate Bill No. 776, Session of 1987, §§ 1, 5(d) & 6(b); House Bill No. 1928, Session of 1987, §§ 3, 4(d), 5(d)–(e), 7(d) & 13), and eight other states which have enacted drug testing laws mandating confirmation of initial drug screens by different or alternative scientific methods.[1] Also, the plaintiff cites federal and state decisions condemning the use of unreliable scientific testing procedures and the use of unconfirmed EMIT drug screening.[2] Further, the plaintiff argues that

1. Connecticut (P.A. 551, L. 1987), Iowa (H.F. 469, L. 1987), Louisiana (Act 464, L. 1987), Minnesota (Ch. 388, L. 1987), Rhode Island (Ch. 540, L. 1987), Vermont (Act 61, L. 1987), Montana (S.B. 338, L. 1987), and Utah (H.B. 154, L. 1987).

2. *Barrel of Fun v. State Farm,* 739 F.2d 1028 (5th Cir.1984); *United States v. Brown,* 557 F.2d 541 (6th Cir.1977); *Jones v. McKenzie,* 628 F.Supp. 1500 (D.C.1986); *Higgs v. Wilson,* 616 F.Supp. 226 (W.D.Ky. 1985); *Johnson v. Walton,* NO. 561–84 Slip Opinion (Vt.Super.Ct. 1985).

all of the experts at trial testified that each would have confirmed the plaintiff's test results with another, alternative procedure rather than replicate the EMIT ST test.

■ Unlike the plaintiff, our review of the evidence does not establish the presence of a "clear" mandate in the form of public policy allowing for the existence of a cause of action for wrongful discharge founded upon the use of a drug screening test, the results of which are not confirmed by an alternative scientific procedure and lead to an individual's loss of employment.

Granted, the two pieces of Pennsylvania legislation referred to by the plaintiff do require that positive drug screen results may not lead to discharge without confirmation. However, the short response to the plaintiff's argument is that the legislation has never been enacted into law in this Commonwealth, which, like a two-edged sword rather than being a buttress for his public policy claim, undermines such an assertion counseling against the creation of a cause of action by judicial fiat for wrongful discharge in drug testing cases.

As for the statutes of our sister states, as well as the federal and state decisions touching on the question at hand, we are not persuaded to join in the creation of an exception to our at-will employment precept. See *e.g.,* *Paul,* supra.

Moreover, the testimony proffered at trial is anything but dispositive as to the unreliability of the EMIT ST test. For example, Dr. Frederick Goldstein, a pharmacologist and the plaintiff's expert, testified that the EMIT ST test "is a good test, it is reliable but not a hundred percent." He would have used the GC/MS test to confirm the presence or absence of cannabinoids in the plaintiff's September 4th specimen, as was recommended by the manufacturer of the EMIT ST test, Syva, in its July, 1986 "policy and procedure guidelines for industry" where a person's job is at stake. He also opined that a laboratory performing drug testing for an employer should confirm a positive EMIT ST result

"by an alternative method and the alternative method that is recommended is the mass spec GC."

On the other hand, the expert for the defense, a Dr. Carl Vereby, stated that the National Institute on Drug Abuse had presided over eight-hundred samples using the EMIT ST and found it to be "a hundred percent reliable." Likewise, the Center for Disease Control had done studies on the EMIT ST test for cannabinoids and its data concluded that "all Emit assays are better than 96 percent reliable...." As for studies done by the witness/expert, he had "not seen false positives in the Emit marijuana test", and he had been in the field for some ten years. His opinion of the EMIT ST test was as follows:

> ... I would say it's one of the most accurate tests I have ever seen and I don't know any testing of any kind that comes as close to being foolproof. [It's 99 percent plus accurate.]

With regard to the September 4th sample testing positive twice on September 5th by the hospital through the EMIT ST, and then the same sample testing positive on September 18th, being erroneous ("false positive") was described by the expert for the defense to be a one in ten-thousand chance. In the same vein, the fact that the September 4th specimen was mailed, unrefrigerated, to the National Medical Center sometime between September 24th and 25th for testing and proved to have a "negative" reading for marijuana was explained by the expert thusly:

> ... there is a possibility that urine left at room temperature would decompose the metabolite by the time the retesting is done.

This was consistent with a study by one Sutheimer appearing in the Journal of Clinical Toxicology in 1985, Volume 9, pages 156–160, i.e., the stability of Delta 9 TCH carboxy (one of the metabolites in marijuana) when kept at room temperature could, in as little as four days, result in the same sample reading "negative". This, in part, was given as a reason by Dr. Verebey as to why the GC/MS test performed by National Medical Center came back negative

on the September 4th urine specimen. The same response applied to testing performed by the EMIT ST manufacturer, Syva.

The other basis for such a difference in results between National Medical Center's and Williamsport Hospital's testing was that the GC/MS tests for a particular (major) metabolite, which if not present in the sample will result in a "negative" reading, whereas the EMIT ST tests for some ten metabolites different than that detected by the GC/MS.[3] This was consistent with the testimony elicited from Dr. Hill and a Ms. Williams, both of whom are employees of the hospital dealing in laboratory work.

Lastly, Dr. Verebey remarked on the plaintiff's efforts to have Syva's brochure and booklet, both recommending that repeat testing of "positive" results be conducted by means other than the initial testing procedure, be equated with a national industry standard in the testing field in the following fashion:

> It's their [Syva's] policy but it's a guide. As a matter of fact the whole country is [in] an upheaval. They don't know what to do with it. So it's cases like these which are going to form the legal basis of testing. Some states have it down a little further than others. I have been testifying in Alaska, in Hawaii and various other places in the country. Everywhere there is something different and currently it's the policy of the [Syva] company and they realize they should change it and it's a growing industry. I guess it's the process of development.

Accordingly, this area of the law being in its nascent stage of development, in conjunction with the absence of a "violation of a clearly mandated public policy which strikes at the heart of a citizen's social right, duties, and responsibilities",

3. Dr. Verebey testified that sixty metabolites have been identified as forming in one's body after inhaling marijuana. Each of us has different biotransformation ways. And, quoting Dr. Verebey, "it is possible that some people form another metabolite and if that's the case, the GC/MS really is looking for one particular metabolite and if that's not happened [sic] to be there and we would get a negative reading."

see, *e.g., McGonagle v. Union Fidelity,* 383 Pa.Super. 223, 229, 556 A.2d 878, 882 (1989), prompts this Court to uphold the compulsory non-suit of the court below as to the plaintiff's wrongful discharge cause of action.

The remaining two issues offered by the plaintiff were disposed of properly by the trial court in its opinion to us at pages 7–9, and we adopt it as our own and for allocatur purposes in rejecting the plaintiff's contentions on appeal.[4]

Judgment affirmed.

---

[4] The two issues raised by the plaintiff appear in his appellate brief at page 7 and read: "(2) WHETHER APPELLANT IS ENTITLED TO A NEW TRIAL BECAUSE THE JURY'S ANSWERS TO SPECIAL JURY QUESTIONS NOS. 1, 2A, 2B AND 5 ARE AGAINST THE WEIGHT OF THE EVIDENCE", "(3) WHETHER APPELLANT IS ENTITLED TO A NEW TRIAL BECAUSE THE LOWER COURT ERRED IN REFUSING TO ALLOW THE TESTIMONY OF APPELLANT AND HIS WIFE AS TO STATEMENTS MADE BY RONALD HEARTON?"