Sarah BORSE, Appellant,

v.

PIECE GOODS SHOP, INC.

No. 91–1197.

United States Court of Appeals,
Third Circuit.

Argued July 31, 1991.

Decided May 13, 1992.

As Amended May 29, 1992.

Order on Denial of Rehearing
July 6, 1992.

---

Hyman Lovitz (argued), Sidney L. Gold, Philadelphia, Pa., for appellant.

Richard E. Santee, Jr. (argued), Bethlehem, Pa., for appellee.

Before BECKER, SCIRICA, and ROTH, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Plaintiff Sarah Borse brought suit against her former employer, Piece Goods Shop, Inc. ("the Shop"), in the district court for the Eastern District of Pennsylvania. She claimed that, by dismissing her when she refused to submit to urinalysis screening and personal property searches (conducted by her employer at the workplace pursuant to its drug and alcohol policy), the Shop violated a public policy that precludes employers from engaging in activities that violate their employees' rights to privacy and to freedom from unreasonable searches. Pursuant to Federal Rule of Civil Procedure 12(b)(6), the district court dismissed her complaint for failure to state a claim on which relief could be granted. This appeal requires us to decide whether an at-will employee who is discharged for refusing to consent to urinalysis screening for drug use and to searches of her personal property states a claim for wrongful discharge under Pennsylvania law.

Because we predict that, under certain circumstances, discharging a private-sector, at-will employee for refusal to consent to drug testing and to personal property searches may violate the public policy embodied in the Pennsylvania cases recognizing a cause of action for tortious invasion of privacy, and because the allegations of Borse's complaint are not sufficient for us to determine whether the facts of this case support such a claim, we will vacate the district court's order and remand with directions to grant leave to amend.

## I. THE ALLEGATIONS OF THE COMPLAINT

Because of the procedural posture of this case, we begin with a summary of the allegations of the complaint. Borse was employed as a sales clerk by the Piece Goods Shop for almost fifteen years. In January 1990, the Shop adopted a drug and alcohol policy which required its employees to sign a form giving their consent to urinalysis screening for drug use and to searches of their personal property located on the Shop's premises.

Borse refused to sign the consent form. On more than one occasion, she asserted that the drug and alcohol policy violated her right to privacy and her right to be free from unreasonable searches and seizures as guaranteed by the United States Constitution. The Shop continued to insist that she sign the form and threatened to discharge her unless she did. On February 9, 1990, the Shop terminated Borse's employment.

The complaint alleges that Borse was discharged in retaliation for her refusal to sign the consent form and for protesting the Shop's drug and alcohol policy. It asserts that her discharge violated a public policy, embodied in the First and Fourth Amendments to the United States Constitution, which precludes employers from engaging in activities that violate their employees' rights to privacy and to freedom from unreasonable searches of their persons and property. Plaintiff seeks compensatory damages for emotional distress, injury to reputation, loss of earnings, and diminished earning capacity. She also alleges that the discharge was willful and malicious and, accordingly, seeks punitive damages.

## II. OVERVIEW OF THE PUBLIC POLICY EXCEPTION TO THE EMPLOYMENT–AT–WILL DOCTRINE IN PENNSYLVANIA

### A. *Choice of Law and Scope of Review*

The district court's subject-matter jurisdiction was based on diversity of citizenship pursuant to 28 U.S.C. § 1332. The jurisdiction of this court is founded upon 28 U.S.C. § 1291.

Federal courts sitting in diversity must apply the substantive law of the state whose laws govern the action. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Our review of the district court's prediction and application of Pennsylvania law is plenary. *Smith v. Calgon Carbon Corp.,* 917 F.2d 1338, 1345 (3d Cir.1990), cert. denied, —— U.S. ——, 111 S.Ct. 1597, 113 L.Ed.2d 660 (1991). Because the Pennsylvania Supreme

Court has not addressed the question whether discharging an at-will employee who refuses to consent to urinalysis and to searches of his or her personal property located on the employer's premises violates public policy, we must predict how that court would resolve the issue should it be called upon to do so. *Smith*, 917 F.2d at 1341; *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 364 (3d Cir.1990). Although decisions by Pennsylvania's intermediate appellate courts are not conclusive in predicting how the state's highest court would decide an issue, they suggest how that court might decide and may constitute presumptive evidence of state law in appropriate circumstances. *McGowan v. University of Scranton*, 759 F.2d 287, 291 (3d Cir.1985).

### B. *Recognition of the Exception by the Pennsylvania Supreme Court*

■ Ordinarily, Pennsylvania law does not provide a common-law cause of action for the wrongful discharge of an at-will employee. Rather, an employer "may discharge an employee with or without cause, at pleasure, unless restrained by some contract." *Henry v. Pittsburgh & Lake Erie Railroad Co.*, 139 Pa. 289, 21 A. 157, 157 (1891) (quoted in *Smith*, 917 F.2d at 1341).

In *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974), however, the Pennsylvania Supreme Court recognized the possibility that an action for wrongful discharge might lie when the firing of an at-will employee violates public policy. Geary, a salesperson, complained to his immediate superiors about the safety of his employer's product. After being told to "follow directions," Geary took his complaints to the vice-president in charge of the product. As a result, the company withdrew the product from the market, but discharged Geary.

Geary argued that an exception to the at-will doctrine was warranted in his case because his dismissal was contrary to public policy. The Pennsylvania Supreme Court disagreed, relying upon two factors to decide that Geary's case did not merit an exception. First, the court observed that Geary was not responsible for monitoring product safety and that he did not possess expertise in that area. 319 A.2d at 178–79. Second, the court noted that Geary had violated the internal chain of command by pressing his concerns before the vice-president. *Id.* at 179–80.

Summarizing its decision, the court stated:

It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened.... [However, w]e hold only that where the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge.

*Id.* at 180. Courts construing Pennsylvania law have interpreted this language as implicitly recognizing that a cause of action for wrongful discharge exists in appropriate circumstances, even though the court refused to uphold such an action on the facts in *Geary*. See, for example, *Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699 (3d Cir.1988) (upholding cause of action). See also *Field v. Philadelphia Electric Co.*, 388 Pa.Super. 400, 565 A.2d 1170 (1989) (same); *Hunter v. Port Authority of Allegheny County*, 277 Pa.Super. 4, 419 A.2d 631 (1980) (same); *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978) (same).

The Pennsylvania Supreme Court did not revisit the validity of the public policy exception to the employment-at-will doctrine until fifteen years after *Geary*. In *Clay v. Advanced Computer Applications, Inc.*, 522 Pa. 86, 559 A.2d 917 (1989), a married couple employed by the same company alleged that they were fired because the wife rejected the sexual advances of a company manager. The court held that their claims were barred because they had failed to seek recourse under the Pennsylvania Human Relations Act, which provides a statutory remedy for wrongful discharges based upon sexual harassment. The court did not deny that it had recognized a public policy exception to the employment-at-will doctrine in *Geary*, but it did stress the narrowness of that exception. The court stated:

[A]s a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship.... Exceptions to this rule have been recognized only in the most limited of circumstances, where discharges of at-will employees would threaten clear mandates of public policy.... Nevertheless, inasmuch as appellees failed to pursue their exclusive stat-

utory remedy for sexual harassment and discrimination in the workplace, they are precluded from relief.

*Id.* at 918–19 (citations omitted).[1]

One year later, the Pennsylvania Supreme Court returned to the issue again. In *Paul v. Lankenau Hospital,* 524 Pa. 90, 569 A.2d 346 (1990), a doctor alleged that a hospital had forced him to resign because he removed five refrigerators, which he claimed that he was authorized to take. He argued that because he had permission to remove the refrigerators, the hospital was estopped from discharging him for taking them. The court held that the doctrine of equitable estoppel is not an exception to the employment-at-will doctrine. *Id.* 569 A.2d at 348. The court also appeared to question the validity of the public policy exception, but it did not expressly inter it. Regarding *Geary,* the court stated:

> The majority in a 4–3 decision held that while some exceptions to the at-will employment doctrine might exist, especially in public policy areas, "this case does not require us to define in comprehensive fashion the perimeters of this privilege, and we decline to do so." ... The Court specifically answered in the negative to the central question of "whether the time has come to impose judicial restraints on an employer's power of discharge."

*Id.* at 348 (citations and footnote omitted). The Pennsylvania Supreme Court has not addressed the public policy exception since *Paul.*

### C. *Application of the Exception by the Pennsylvania Superior Court*

The Pennsylvania Superior Court first upheld a wrongful discharge cause of action based on the public policy exception in *Reuther v. Fowler & Williams, Inc.,* 255 Pa.Super. 28, 386 A.2d 119 (1978). Reuther alleged that he was discharged for missing work for a week in order to serve jury duty. The court first observed that "[t]he jury system and jury service are of the highest importance to our legal process."

386 A.2d at 120. As evidence of the strong public policy encouraging jury service, the court then cited the Pennsylvania Constitution's guarantee of the right to trial by jury, a Pennsylvania statute providing that summonses for jury service shall be deemed summonses of the court, another Pennsylvania statute providing that persons who fail to appear for jury duty when summoned may be fined, and the United States Supreme Court's identification of trial by jury as "fundamental to the American scheme of justice." *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968). The court thus concluded that "the necessity of having citizens freely available for jury service is just the sort of 'recognized facet of public policy' alluded to by our Supreme Court in *Geary.*" 386 A.2d at 121. Accordingly, the court held that Reuther had stated a cause of action.

The Superior Court also upheld a cause of action for wrongful discharge in *Hunter v. Port Authority of Allegheny County,* 277 Pa.Super. 4, 419 A.2d 631 (1980). Hunter alleged that the Port Authority had denied his application for employment as a bus driver because of a thirteen-year old assault conviction for which he had since been pardoned. The court noted that the federal courts had held that banning a person convicted of past misconduct from public employment violates federal law unless the ban is rationally related to a legitimate governmental objective. The court also observed that the Pennsylvania legislature had recently enacted a statute limiting an employer's reliance upon criminal records when making employment decisions. The court then turned to Pennsylvania Supreme Court decisions interpreting Article I, section 1 of the Pennsylvania constitution[2] as prohibiting the government from interfering with the "right to engage in any of the common occupations of life" without a reasonable relationship to a legitimate governmental objective. 419 A.2d at 635. In reliance upon those decisions and "'the deeply ingrained public policy of this State ... to avoid unwarranted stigmatization of

---

**1.** Chief Justice Nix wrote separately to indicate that he did not read *Geary* as creating a cause of action for wrongful discharge, however. He stated:

> [T]his Court did not announce a cause of action for wrongful discharge in *Geary.* The language relied upon by the Superior Court in its analysis of *Geary* was gratuitous *dicta* and could not possibly have created a tort cause of action for wrongful discharge. Indeed, the language in *Geary* clearly states that a cause

of action for wrongful discharge in an at-will employment relationship does not exist.

559 A.2d at 923 (Nix concurring).

**2.** Article I, section 1 provides:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

and unreasonable restrictions upon former offenders,' " *id.* at 636 n. 5 (quoting *Secretary of Revenue v. John's Vending Corp.*, 453 Pa. 488, 309 A.2d 358, 362 (1973)), the court held that Hunter had stated a cause of action under Article I, section 1 of the Pennsylvania Constitution.

*Field v. Philadelphia Electric Co.*, 388 Pa.Super. 400, 565 A.2d 1170 (1989), is the most recent Superior Court decision upholding a wrongful discharge cause of action based on the public policy violation. Plaintiffs, a married couple employed by companies that provided services to the Philadelphia Electric Company ("PECO"), alleged that they were discharged because the husband had notified the Nuclear Regulatory Commission that PECO had violated the Commission's regulations. The court held that the alleged discharge contravened public policy because federal law required Field to report the violations, nothing in the complaint indicated that he had bypassed the internal chain of command, Field was an expert in the area, and the public potentially was endangered by the violations. Specifically, the court reasoned:

> Since a statutory duty to act is present, since discharge was based on performance of that statutory duty, and since performance of that duty directly and clearly protects public safety, we believe a cause of action for wrongful discharge exists in this case.

565 A.2d at 1180.

The Superior Court's first statement of general principles for determining whether a cause of action for wrongful discharge exists (in contrast to the case-by-case application of *Geary*) came in a decision in which it rejected the plaintiff's claim. In *Yaindl v. Ingersoll–Rand Co.*, 281 Pa.Super. 560, 422 A.2d 611 (1980), the court explained that the employer's interest in running its business as it sees fit must sometimes yield to the employee's interest in making a living and to the public's interest in ensuring that the employer does not act abusively. 422 A.2d at 617. The court then analogized the wrongful discharge action to an action for intentional interference with the performance of a contract

and reasoned that in determining whether a discharge is wrongful, it should consider the same factors that courts consider in assessing whether an intentional interference with the performance of a contract is improper. *Id.* at 618.[3] Specifically, the court stated that the "employer's interest in running its business, its motive in discharging [the employee] and its manner of effecting the discharge, and any social interests or public policies that may be implicated in the discharge" must be "balanc[ed] against [the employee's] interest in making a living." *Id.* at 620.

*Yaindl* appeared to expand the public policy exception dramatically. When an employer arbitrarily discharges an employee, the employee's interest in earning a living will usually outweigh the employer's interest. Therefore, because *Yaindl* requires the court to balance the employee's interest in earning a living against the employer's interest, it could be read as establishing a just cause requirement for discharging an at-will employee. See Comment, *The Role of Federal Courts in Changing State Law: The Employment at Will Doctrine in Pennsylvania*, 133 U Pa L Rev 227, 251 (1984) (reading *Yaindl* in this manner).

The *Yaindl* test proved short-lived, however; the court reformulated it only four years later in *Cisco v. United Parcel Services, Inc.*, 328 Pa.Super. 300, 476 A.2d 1340 (1984). See *Rinehimer v. Luzerne County Community College*, 372 Pa.Super. 480, 539 A.2d 1298, 1301 (1988) (*Cisco* "redefined the *Yaindl* balancing test"). Rather than balance the individual employee's right to earn a living against the individual employer's interests, *Cisco* restored the focus on public policy. It stated:

> First, we must discern whether any public policy is threatened [by the discharge of an at-will employee]; second, even when an important public policy is involved, an employer may discharge an employee if he has separate, plausible and legitimate reasons for doing so.

476 A.2d at 1343.

In addition to retaining the focus on public policy, subsequent decisions by the Su-

---

**3.** Those factors include:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

*Id.* at 618 (quoting Restatement (Second) of Torts § 767 (1979)).

perior Court have stressed that the public policy allegedly violated by the discharge must be clearly stated. For example, in *Turner v. Letterkenny Federal Credit Union*, 351 Pa.Super. 51, 505 A.2d 259 (1985), the court explained that *Geary*

> held that where no *clear* mandate of public policy is violated by a termination, an employee has no right to action against his employer. The [*Geary*] court made clear that an essential element in permitting a cause of action for wrongful discharge was a finding of a *clearly* defined mandate of public policy.

505 A.2d at 260 (emphasis added). The court further stated that *Geary* and subsequent cases

> demonstrate a pattern of favoring the employer's interest in running its business.... [T]o overcome the employer's interest in running a business, the employee must show a violation of a *clearly* mandated public policy which "strikes at the heart of a citizen's social right, duties, and responsibilities."

*Id.* at 261 (emphasis added) (quoting *Novosel v. Nationwide Ins. Co.*, 721 F.2d 894, 899 (3d Cir.1983)). See also *Rinehimer*, 539 A.2d at 1302 (*Turner* noted that employee had to show a violation of a *clearly mandated* public policy) (emphasis in original); *id.* at 1304 (specificity and clarity necessary to sustain wrongful discharge action); *McGonagle v. Union Fidelity Corp.*, 383 Pa.Super. 223, 556 A.2d 878, 884 (1989), appeal denied, 525 Pa. 584, 575 A.2d 115 (1990) ("[W]here the public policy claimed to be violated is not 'clear,' a cause of action for wrongful discharge has not been recognized."); 556 A.2d at 885 ("[U]nless an employee identifies a 'specific' expression of public policy violated by his discharge, it will not be labelled as wrongful and within the sphere of public policy.").

In sum, the Superior Court continues to interpret Pennsylvania law as recognizing the public policy exception, but its most recent decisions emphasize that the exception is a narrow one. See *Burkholder v. Hutchison*, 403 Pa.Super. 498, 589 A.2d 721, 723 (1991) (characterizing exception as "extremely narrow"); *Yetter v. Ward Trucking Corp.*, 401 Pa.Super. 467, 585 A.2d 1022, 1025 (1991) (exception recognized in "only the most limited of circumstances") (quoting *Paul*, 569 A.2d at 346).

The public policy violated must be clear and specific before the court will uphold the cause of action.

### D. Third Circuit Opinions Applying the Public Policy Exception under Pennsylvania Law

In a series of cases decided after *Geary*, but before *Clay* and *Paul*, this court read *Geary* as recognizing a public policy exception to the employment-at-will doctrine. *Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699 (3d Cir.1988); *Novosel v. Nationwide Ins. Co.*, 721 F.2d 894 (3d Cir. 1983); *Bruffett v. Warner Communications, Inc.*, 692 F.2d 910 (3d Cir.1982); *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363 (3d Cir.1979). In our most recent case on the issue, *Smith v. Calgon Carbon Corp.*, 917 F.2d 1338 (3d Cir.1990), cert. denied, — U.S. —, 111 S.Ct. 1597, 113 L.Ed.2d 660 (1991), we acknowledged that *Clay* and *Paul* cast some doubt on interpreting *Geary* as recognizing the public policy exception, but we concluded that

> in the absence of a *clear* statement by the Pennsylvania Supreme Court to the contrary or other persuasive evidence of a change in Pennsylvania law, we are bound by the holdings of previous panels of this court.

*Id.* at 1343 (emphasis in original).

As we have noted above, the Pennsylvania Supreme Court has not addressed the public policy exception since its decision in *Paul*. We are aware of no "persuasive evidence of a change in Pennsylvania law." As we have also explained, the Pennsylvania Superior Court continues to interpret Pennsylvania law as recognizing the public policy exception. Accordingly, we continue to interpret *Geary* as recognizing a cause of action for wrongful discharge when dismissal of an at-will employee violates a clear mandate of public policy.

### III. SOURCES OF PUBLIC POLICY

In order to evaluate Borse's claim, we must attempt to "discern whether any public policy is threatened" by her discharge. *Cisco*, 476 A.2d at 1343.[4] As evidence of a public policy that precludes employers from discharging employees who refuse to consent to the practices at issue, Borse primarily relies upon the First and Fourth Amendments to the United States Constitution and the right to privacy included in the

---

**4.** The second prong of the *Cisco* test, determining whether the employer has a separate plausible and legitimate reason for discharging the employee, is not at issue here. See *Field*, 565 A.2d at 1182.

Pennsylvania Constitution. As will be seen, we reject her reliance on these constitutional provisions, concluding instead that, to the extent that her discharge implicates public policy, the source of that policy lies in Pennsylvania common law.

## A. Constitutional Provisions

### 1. The United States Constitution

■ Although the Supreme Court has made clear that the Constitution proscribes only the *government* from violating the individual's right to privacy, and to freedom from unreasonable searches, *Skinner v. Railway Labor Executives Association*, 489 U.S. 602, 614, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989) (Fourth Amendment does not apply to searches by private party), Borse argues that our decision in *Novosel v. Nationwide Insurance Co.*, 721 F.2d 894 (3d Cir.1983), permits us to consider the public policies embodied in the First and Fourth Amendments despite the lack of state action. In *Novosel*, defendant Nationwide instructed its employees to participate in its effort to lobby the Pennsylvania House of Representatives, which was then considering an insurance reform act. Specifically, Nationwide directed its employees to clip, copy, and obtain signatures on coupons bearing the insignia of the Pennsylvania Committee for No–Fault Reform. Novosel alleged that he was discharged for refusing to participate in the lobbying effort and for privately stating opposition to his employer's political stand.

In response to Novosel's claim, Nationwide argued that a wrongful discharge action depends upon the violation of a *statutorily* recognized public policy. We disagreed. We observed that "both *Reuther* and *Hunter* allowed causes of action to be implied directly from the Pennsylvania Constitution." *Id.* at 898. We also pointed out that "*Hunter* further noted that Pennsylvania courts allow direct causes of action under the Constitution regardless of legislative action or inaction." *Id* (citation omitted). After noting that the public policy exception applies only in the absence of statutory remedies, we reasoned:

> Given that there are no statutory remedies available in the present case and taking into consideration the importance of the political and associational freedoms of the federal and state Constitu-

tions, the absence of a statutory declaration of public policy would appear to be no bar to the existence of a cause of action. Accordingly, a cognizable expression of public policy may be derived in this case from either the First Amendment of the United States Constitution or Article I, Section 7 of the Pennsylvania Constitution.[5]

*Id.* at 899.

In deciding not to extend *Novosel* to Borse's claim, the district court remarked upon the Pennsylvania Superior Court's reluctance to rely upon constitutional provisions as sources of public policy. According to the district court, the Superior Court has never upheld such an action. The district court also noted that, although the Superior Court "has formulated a list of appropriate sources of public policy," its list does not include constitutional provisions. Moreover, the district court observed that in *Booth v. McDonnell Douglas Truck Services, Inc.*, 401 Pa.Super. 234, 585 A.2d 24, *appeal denied*, 528 Pa. 620, 597 A.2d 1150 (1991), the Superior Court refused to uphold a wrongful discharge action that relied upon a constitutional provision as a source of public policy because, among other reasons, plaintiff made no allegation of state action. The district court reasoned that the Superior Court's requirement of state action in *Booth* "is no less applicable to [Borse's] cause of action under policies manifested in the First and Fourth Amendments of the United States Constitution."

■ To the extent that the district court's opinion suggests that a constitutional provision may never serve as a source of public policy in Pennsylvania wrongful discharge actions, we disagree. Although the Superior Court has never upheld a wrongful discharge cause of action that depended upon a public policy stated *solely* in a constitutional provision, two of its three cases upholding wrongful discharge causes of action relied upon constitutional provisions as evidence of public policy. See *Hunter*, 419 A.2d at 635 (relying upon Pennsylvania Constitution); *Reuther*, 386 A.2d at 121 (looking to United States Constitution). Moreover, unlike the district court, we do not read an intent to proscribe reliance on constitutional provisions from the "list of appropriate sources

5. Article I, section 7 states in pertinent part: The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.

of public policy" quoted in *Cisco*.[6] As the district court observed, that list does not explicitly include constitutional provisions. Yet nothing in *Cisco* indicates that the Superior Court intended it to serve as an exhaustive enumeration of the sources that courts may consider as evidence of public policy. In contrast, a more recent decision by that court expressly contemplates the use of constitutional provisions as sources of public policy. In *Scott v. Extracorporeal Inc.*, 376 Pa.Super. 90, 545 A.2d 334 (1988), the court stated: "It is generally accepted that to be actionable, the asserted public policy must be one which is already articulated in law or a constitutional provision." 545 A.2d at 342.

Even though the district court may have overestimated the Superior Court's hostility to reliance upon constitutional provisions as sources of public policy, it correctly refused to extend *Novosel* to Borse's claim. As the district court observed, the Superior Court has refused to extend constitutional provisions designed to restrict governmental conduct in the absence of state action. One year after *Novosel* was decided, the Superior Court refused to import constitutional principles into a wrongful discharge action against a private employer. In *Cisco*, a worker employed by United Parcel Services ("UPS") to deliver packages was charged with theft in connection with a routine delivery. While the charges were pending, UPS insisted that Cisco resign. Even though Cisco was later acquitted by a jury, UPS refused to reinstate him.

Cisco identified the public policy allegedly violated by the discharge as a criminal defendant's right to a presumption of innocence. Specifically, he argued that the presumption becomes meaningless if an individual may be discharged merely because of an accusation. The court observed:

> While the full panoply of rights incident to a criminal defendant were entitlements of [Cisco] in his trial experience, including the right to be presumed innocent until proven guilty, these rights which are ensured by both the United States and Pennsylvania Constitutions

are not necessarily meant to, nor can they[ ] be[,] superimposed onto an accused's remaining life experiences.

476 A.2d at 1344. Thus, *Cisco* refused to apply constitutional restrictions on state action to a discharge by a private employer.

The court took the same approach in *Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. 199, 511 A.2d 830 (1986), in which a newspaper fired an employee for placing a classified advertisement in a competing newspaper. The employee argued that the discharge violated public policy because it penalized her for exercising her right to free speech under the Pennsylvania Constitution. The court disagreed, reasoning that "while the constitutional right of free speech is accorded a person who advertises, these rights are not meant to be, nor can they be, superimposed and extended to all other aspects of his life." *Id.* at 844. See also *Veno v. Meredith*, 357 Pa.Super. 85, 515 A.2d 571 (1986) (relying on same reasoning to reject wrongful discharge claim of newspaper editor fired for publishing article criticizing judge).

The Superior Court reiterated the importance of the state action requirement just last year. In *Booth*, plaintiff alleged that his employer discharged him in order to avoid paying a commission due him. He argued that the discharge violated the public policy enunciated in Article I, section 17 of the Pennsylvania Constitution, which prohibits laws impairing the obligations of contracts. The Superior Court disposed of the argument on the ground that the constitutional provision did not apply because no allegation of state action had been made. 585 A.2d at 28.

The Pennsylvania Supreme Court has not considered the propriety of applying constitutional principles to wrongful discharge actions against private employers. Its most recent decisions regarding the cause of action admonish us, however, that the public policy exception applies "only in the most limited of circumstances," *Paul*, 569 A.2d at 348 (quoting *Clay*, 559 A.2d at 918). Moreover, even though *Cisco, Mar-*

**6.** In *Cisco,* the court stated:

> A clear statement of what public policy actually consists is hindered by its varying manifestations. As the Supreme Court of New Jersey observed:
>
> > The sources of public policy [which may limit the employer's right of discharge] include legislation; administrative rules, regulation, or decision; and judicial decision. In

certain instances, a professional code of ethics may contain an expression of public policy.... Absent legislation, the judiciary must define the cause of action in case-by-case determinations.

*Id.* at 1343 (quoting *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 72, 417 A.2d 505, 512 (1980)).

tin, Veno, and *Booth* did not explicitly address *Novosel's* reliance upon a constitutional provision in the absence of state action, the clear trend of those cases indicates that the Pennsylvania courts would be highly unlikely to extend *Novosel.*

*Novosel's* holding (i.e., that using the power of discharge to coerce employees' political activity violates public policy) is not at issue here and thus we need not decide whether the recent Pennsylvania cases constitute such "persuasive evidence of a change in Pennsylvania law" that we are free to disregard it. See *Smith*, 917 F.2d at 1343. Instead, we need only decide whether to *extend* the approach taken in *Novosel.* In light of the narrowness of the public policy exception and of the Pennsylvania courts' continuing insistence upon the state action requirement, we predict that if faced with the issue, the Pennsylvania Supreme Court would not look to the First and Fourth Amendments as sources of public policy when there is no state action. Accordingly, we decline to extend the approach taken in *Novosel* to this case.

### 2. The Pennsylvania Constitution

■ Although Borse's complaint did not rely upon the Pennsylvania Constitution as a source of public policy, the parties submitted supplemental briefs on this issue at our request. Article I, section 1· of the Pennsylvania Constitution explicitly protects the right of privacy.[7] See *In re June 1979 Allegheny County Investigating Grand Jury,* 490 Pa. 143, 415 A.2d 73, 77 (1980) ("*Allegheny Grand Jury*"). On two occasions, the Pennsylvania Supreme Court has held that court-ordered disclosure of personal information implicates the right of privacy protected by the Pennsylvania Constitution. See *Allegheny Grand Jury,* 415 A.2d at 77–78 (disclosure of medical information); *In re "B",* 482 Pa. 471, 394 A.2d 419, 425 (1978) (disclosure of psychiatric records).

That court has not specifically decided whether the right of privacy protected by the Pennsylvania Constitution extends to

7. We set forth the text of Article I, section 1 in note 2.

8. In *Vogel v. W.T. Grant Co.,* 458 Pa. 124, 327 A.2d 133 (1974), the Pennsylvania Supreme Court adopted the definition of tortious invasion of privacy as stated in a tentative draft of the Restatement (Second) of Torts § 652 (Tent Draft No 13, 1967). Although the Pennsylvania Supreme Court has not expressly adopted the

private actors. The court has observed, however, that:

> Article 1 is entitled "Declaration of Rights" and all of the first twenty-six sections of Article 1 which state those specific rights, must be read as limiting the power of government to interfere with the rights provided therein.... [T]he first twenty-six sections of Article 1 ... merely contain a limitation on the powers of government.

*Commonwealth v. National Gettysburg Battlefield Tower, Inc.,* 454 Pa. 193, 311 A.2d 588, 592 (1973).· Accordingly, we·predict that if faced with the issue, the Pennsylvania Supreme Court would hold that the right of privacy protected by the Pennsylvania Constitution does not encompass invasions of privacy committed by private actors. Therefore, we also predict that the Pennsylvania courts would not look to that constitutional provision as evidence of public policy in a wrongful discharge action against a private employer.

### B. Pennsylvania Common Law

■ Although we have rejected Borse's reliance upon constitutional provisions as evidence of a public policy allegedly violated by the Piece Goods Shop's drug and alcohol program, our review of Pennsylvania law reveals other evidence of a public policy that may, under certain circumstances, give rise to a wrongful discharge action related to urinalysis or to personal property searches. Specifically, we refer to the Pennsylvania common law regarding tortious invasion of privacy.

■ Pennsylvania recognizes a cause of action for tortious "intrusion upon seclusion." *Marks v. Bell Telephone Co.,* 460 Pa. 73, 331 A.2d 424, 430 (1975). The Restatement defines the tort as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B.[8]

final version of section 652, our analysis of Pennsylvania law in *O'Donnell v. United States,* 891 F.2d 1079 (3d Cir.1989), led us to predict that it would do so if presented with the issue. See *id.* at 1082 n. 1. See also *Vernars v. Young,* 539 F.2d 966 (3d Cir.1976) (upholding invasion of privacy claim under Pennsylvania law when corporate officer opened and read personal mail addressed to fellow employee).

▉▉▉▉ Unlike the other forms of tortious invasion of privacy,[9] an action based on intrusion upon seclusion does not require publication as an element of the tort. *Harris by Harris v. Easton Publishing Co.*, 335 Pa.Super. 141, 483 A.2d 1377, 1383 (1984). The tort may occur by (1) physical intrusion into a place where the plaintiff has secluded himself or herself; (2) use of the defendant's senses to oversee or overhear the plaintiff's private affairs; or (3) some other form of investigation or examination into plaintiff's private concerns. 483 A.2d at 1383. Liability attaches only when the intrusion is substantial and would be highly offensive to "the ordinary reasonable person." *Id.* at 1383–84.

We can envision at least two ways in which an employer's urinalysis program might intrude upon an employee's seclusion. First, the particular manner in which the program is conducted might constitute an intrusion upon seclusion as defined by Pennsylvania law. The process of collecting the urine sample to be tested clearly implicates "expectations of privacy that society has long recognized as reasonable," *Skinner v. Railway Labor Executives Association*, 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989).[10] In addition, many urinalysis programs monitor the collection of the urine specimen to ensure that the employee does not adulterate it or substitute a sample from another person. See, for example, 109 S.Ct. at 1413 (noting that in some cases, visual or aural observation of urination is required). See also *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 660, 109 S.Ct. 1384, 1388, 103 L.Ed.2d 685 (1989). Monitoring collection of the urine sample appears to fall within the definition of an intrusion upon seclusion because it involves the use of one's senses to oversee the private activities of another. Restatement (Second) of Torts § 652B, comment b. See also *Harris*, 483 A.2d at 1383.

As the United States Supreme Court has observed:

There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all.

It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom. *Skinner*, 109 S.Ct. at 1413 (quoting *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 (5th Cir.1987), aff'd in part, vacated in part, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)). If the method used to collect the urine sample fails to give due regard to the employees' privacy, it could constitute a substantial and highly offensive intrusion upon seclusion. See Mark A. Rothstein, *Drug Testing in the Workplace: The Challenge to Employment Relations and Employment Law*, 63 Chi–Kent L Rev 683, 729 (1987) (public policy exception to employment-at-will doctrine most likely to be applied when employer requires direct observation of urination). See also *Kelley v. Schlumberger Technology Corp.*, 849 F.2d 41 (1st Cir.1988) (upholding jury verdict that employer's urinalysis program involving direct observation of urination invaded common-law right of privacy under Louisiana law).

Second, urinalysis "can reveal a host of private medical facts about an employee, including whether she is epileptic, pregnant, or diabetic." *Skinner*, 109 S.Ct. at 1413. A reasonable person might well conclude that submitting urine samples to tests designed to ascertain these types of information constitutes a substantial and highly offensive intrusion upon seclusion.

The same principles apply to an employer's search of an employee's personal property. If the search is not conducted in a a discreet manner or if it is done in such a way as to reveal personal matters unrelated to the workplace, the search might well constitute a tortious invasion of the employee's privacy. See, for example, *K–Mart Corp. Store No. 7441 v. Trotti*, 677 S.W.2d 632 (Tex.App.1984) (search of employee's locker). See also *Bodewig v. K–Mart, Inc.*, 54 Or.App. 480, 635 P.2d 657 (1981) (subjecting cashier accused of stealing to strip search).

The Pennsylvania courts have not had occasion to consider whether a discharge

---

**9.** The action for invasion of privacy encompasses four analytically distinct torts. In addition to intrusion upon seclusion, the tort also includes (1) appropriation of name or likeness; (2) publicity given to private life; and (3) publicity placing a person in a false light. See *Marks*, 331 A.2d at 430.

**10.** At pages 619–21, we caution against the wholesale application to private employers of the limitations imposed on public employers by the Fourth Amendment. We find the cases involving government employers helpful, however, in defining the individual privacy interest implicated by urinalysis.

related to an employer's tortious invasion of an employee's privacy violates public policy. The district court for the Western District of Pennsylvania has addressed this question in applying Pennsylvania law, however. In *Rogers v. International Business Machines Corp.*, 500 F.Supp. 867 (W.D.Pa.1980), plaintiff argued that IBM's decision to discharge him violated public policy because it was based upon an investigation of a personal matter (an alleged affair with a co-worker) that invaded his right of privacy. The court examined the record to determine whether the investigation intruded upon plaintiff's seclusion. After determining that IBM had confined its investigation to interviewing other employees and examining company records, the court concluded that IBM's procedures were reasonable and did not violate public policy.

■ We predict that the Pennsylvania Supreme Court would follow the approach taken in *Rogers*. In other words, we believe that when an employee alleges that his or her discharge was related to an employer's invasion of his or her privacy, the Pennsylvania Supreme Court would examine the facts and circumstances surrounding the alleged invasion of privacy. See *Cisco*, 476 A.2d at 1343 (emphasizing necessity of examining all the circumstances in wrongful discharge cases). If the court determined that the discharge was related to a substantial and highly offensive invasion of the employee's privacy, we believe that it would conclude that the discharge violated public policy.[11] Indeed, the following language in *Geary* might well be considered to presage such an approach:

> It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened.

319 A.2d at 180.

The Pennsylvania Superior Court's decision in *Hershberger v. Jersey Shore Steel Co.*, 394 Pa.Super. 363, 575 A.2d 944 (1990), appeal denied, 527 Pa. 601, 589 A.2d 691 (1991), does not foreclose the possibility of a wrongful discharge action based upon an employer's urinalysis program. In *Hershberger*, the employer discharged plaintiff after his urine tested positive for drugs. Two weeks later, plaintiff underwent another urinalysis on his own initiative and also arranged for the specimen from the first test to be analyzed by a more technically sophisticated method. Even though both latter tests were negative, the employer refused to rehire plaintiff.

The sole issue before the court was whether a clear mandate of public policy prohibits a private employer from discharging an employee on the basis of a positive drug test without confirming the results of the initial drug test by another, scientifically distinct test. As evidence that such a public policy exists, plaintiff argued that: (1) other states had enacted legislation requiring confirmatory testing; (2) Pennsylvania was then considering similar legislation; and (3) the federal and state courts had criticized the use of unconfirmed tests. In addition, plaintiff presented expert testimony regarding the desirability of confirmatory testing.

The court refused to rely upon the legislation requiring confirmatory testing because the bills before the Pennsylvania legislature were still pending. Moreover, the court concluded that the expert testimony was not dispositive regarding the unreliability of the test the employer used. Therefore, the court held that plaintiff had failed to establish the existence of a public policy requiring employers to perform confirmatory testing.

According to the district court, *Hershberger* "implicitly holds, *sub silentio*, that no public policy, constitutional or otherwise, inhibits a private employer from requiring its employees to submit to urine testing for the presence of drugs and alcohol." It may be that *Hershberger* implicitly assumes that public policy does not preclude a private employer from requiring its employees to undergo urinalysis for drug use *per se*, but to us it is not clear that it does. The court may have elected to dispose of the case adversely to the plaintiff on the basis of the sole question presented without reaching a more difficult issue (the one before us now) that appears not to have been presented. Thus, we do not read *Hershberger* as foreclosing the possibility

---

**11.** The Sixth Circuit recently rejected an invasion of privacy claim challenging an employer's urinalysis program. *Baggs v. Eagle–Picher Industries, Inc.*, 957 F.2d 268 (6th Cir.1992) (applying Michigan law). Michigan law permits an employer to use "intrusive and even objectionable means to obtain employment-related information about an employee." *Id.* at 275. In contrast, Pennsylvania has not exempted employers from the principles ordinarily applied in actions for tortious invasion of privacy.

that, under some circumstances, an employer's urinalysis program may violate public policy.

Only a handful of other jurisdictions have considered urinalysis programs implemented by private employers.[12] The majority of these decisions balance the employee's privacy interest against the employer's interests in order to determine whether to uphold the programs. See, for example, *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123 (Alaska 1989). In *Luedtke*, two employees challenged their employer's urinalysis program, alleging violation of their state constitutional right of privacy, common-law invasion of privacy, wrongful discharge, and breach of the covenant of good faith and fair dealing. (Under Alaska law, the public policy exception to the employment-at-will doctrine is "largely encompassed within the implied covenant of good faith and fair dealing." 768 P.2d at 1130, quoting *Knight v. American Guard & Alert, Inc.*, 714 P.2d 788, 792 (Alaska 1986)). After determining that the relevant provision of the Alaska constitution did not apply to private action, the Alaska Supreme Court concluded that a public policy protecting an employee's right to withhold private information from his employer exists in Alaska and that violation of that policy "may rise to the level of a breach of the implied covenant of good faith and fair dealing," 768 P.2d at 1130.

As evidence of public policy, the court looked to the state's statutes,[13] Constitution,[14] and common law.[15] The court concluded:

Thus, the citizens' right to be protected against unwarranted intrusions into their private lives has been recognized in the law of Alaska. The constitution protects against governmental intrusion, statutes protect against employer intrusion, and the common law protects against intrusions by other private persons. As a result, there is sufficient evidence to support the conclusion that there exists a public policy protecting spheres of employee conduct into which employers may not intrude.

*Id.* at 1133.

The court then turned to the question "whether employer monitoring of employee drug use outside the work place is such a prohibited intrusion," *id.* at 1133. The court reasoned that the boundaries of the employee's right of privacy "are determined by balancing [that right] against other public policies, such as 'the health, safety, rights and privileges of others.'" *Id.* at 1135–36 (quoting *Ravin v. State*, 537 P.2d 494, 504 (Alaska 1975)). Because the *Luedtke* plaintiffs performed safety-sensitive jobs, the court concluded that the public policy supporting the protection of the health and safety of other workers justified their employer's urinalysis program. 768 P.2d at 1136.

The West Virginia Supreme Court also applied a balancing test in *Twigg v. Hercules Corp*, 185 W.Va. 155, 406 S.E.2d 52 (1990). The case arose when the district court for the Northern District of West

---

12. Several of these cases are inapposite because they involve state law that differs significantly from Pennsylvania's. For example, some state constitutions include a right of privacy that applies to private action. See, for example, *Luck v. Southern Pacific Transportation Co.*, 218 Cal. App.3d 1, 267 Cal.Rptr. 618, 627–28, cert. denied, —— U.S. ——, 111 S.Ct. 344, 112 L.Ed.2d 309 (1990). Other states have passed legislation regulating urinalysis programs implemented by private employers, see generally Morgan, Lewis & Bockius, eds, *Drug Testing in the Work Place: State-by-State Drug and Alcohol Testing Survey*, 33 Wm & Mary L Rev 189 (1991) (collecting statutes). Finally, some cases have rejected challenges to urinalysis programs for the reason that state law does not recognize a public policy exception to the employment-at-will doctrine. See, for example, *Greco v. Halliburton Co.*, 674 F.Supp. 1447 (D.Wyo.1987). Our discussion in the text focuses on selected cases typifying the various approaches taken in the remaining cases. We are unaware of any case considering whether the dismissal of an at-will employee who refuses to consent to personal property searches violates public policy.

13. The court observed that a statute prohibiting employers from requiring employees to take polygraph tests as a condition of employment supports "the policy that there are private sectors of employees' lives not subject to direct scrutiny by their employers." 768 P.2d at 1132. The court also noted that a statute prohibiting employment discrimination on the basis of, among other things, marital status, changes in marital status, pregnancy or parenthood, demonstrates "that in Alaska certain subjects are placed outside the consideration of employers in their relations with employees." *Id.*

14. The court reasoned that although Alaska's constitutional right of privacy does not proscribe private action, the inclusion of a specific clause protecting the right "supports the contention that this right 'strike[s]' at the heart of a citizen's social rights.'" *Id.* at 1132–33 (no citation given).

15. The court observed that the action for tortious intrusion upon seclusion evidences the existence of a common-law right of privacy. *Id.* at 1133.

Virginia certified the following question to the court:

Can the discharge of an employee for refusing to submit to urinalysis as part of a random drug test violate a substantial public policy of West Virginia and subject the employer to damages under [West Virginia law] when the employer has no individualized suspicion of drug usage and the drug test is not prohibited by state statute?

In response, the court observed that it had previously held that requiring employees to submit to polygraph tests violated the state's public policy of protecting individual privacy rights. The court then reasoned:

[I]t is unquestionable that since we do recognize a "legally protected interest in privacy" and have previously found that requiring employees to submit to polygraph examinations violates public policy based upon this privacy right, we likewise recognize that it is contrary to public policy in West Virginia for an employer to require an employee to submit to drug testing, since such testing portends an invasion of an individual's right to privacy.

Id at 55.[16]

Even some courts that have held that urinalysis programs conducted by private employers do not violate the public policy exception to the employment-at-will doctrine have balanced the employee's interests against the employer's. *Hennessey v. Coastal Eagle Point Oil Company*, 247 N.J.Super. 297, 589 A.2d 170, certif. granted, 126 N.J. 340, 598 A.2d 898 (1991), provides an example of this approach. After refusing to apply federal and state constitutional prohibitions against unreasonable searches to private employers, the *Hennessey* court conceded, for the sake of argument, that the right of privacy may serve as a source of public policy. The court opined, however, that the intrusion upon privacy implicated by urinalysis had been "overstated." 589 A.2d at 177. The court also observed that the urinalysis program served public policy by deterring drug use and that the employer had a legitimate interest in eliminating drug use in the

workplace. Because the court considered the invasion of privacy minimal and the employer's interests substantial,[17] it concluded, on the basis of this balancing, that the employer had not violated a clear mandate of public policy and hence that discharging an employee who tested positive for drugs did not fall within the public policy exception to the employment-at-will doctrine.

The court in *Hennessey* was much more reluctant than the *Luedtke* and *Twigg* courts to recognize the privacy interest raised by the employer's urinalysis program. We find it significant, however, that in *Hennessey* it was clear that the particular program at issue did not constitute a substantial and highly offensive invasion of privacy. First, the urine specimens were tested solely for drugs. 589 A.2d at 173. Second, although monitors were present during the collection of the specimens, the monitors stood behind the employees and were specifically instructed "not to look at any of the employees' genitalia or private parts." *Id.* We suspect that given these circumstances, a reasonable person would not find the program highly offensive.

Although most other jurisdictions have applied a balancing test to urinalysis programs conducted by private employers, not all have done so. In *Jennings v. Minco Technology Labs, Inc.*, 765 S.W.2d 497 (Tex.App.1989), for example, the Texas Court of Appeals upheld an employer's random urinalysis program without balancing the employee's interests against the employer's. The court upheld the program for two reasons. First, the court reasoned that although the Texas Supreme Court had on one occasion recognized an exception to the employment-at-will doctrine based on public policy, see *Sabine Pilot, Inc. v. Hauck*, 687 S.W.2d 733 (Tex.1985), the "lower courts are not free to create additional exceptions," 765 S.W.2d at 501, particularly in the absence of a statute explicitly recognizing the public policy allegedly violated by the discharge, *id.* at 501 & 501 n. 3. Second, the court reasoned that the employer's urinalysis program would not violate plaintiff's privacy be-

---

**16.** Although the court held that discharging an employee who refused to submit to urinalysis violated public policy, it recognized two exceptions: when the urinalysis is based upon "reasonable good faith objective suspicion" of an employee's drug use or when the employee's job

involves public safety or the safety of others. 406 S.E.2d at 55.

**17.** The court noted that in his job as a "lead pumper" at a refinery, Hennessey worked with combustible materials, some of which are also toxic.

cause her urine would be tested only if she consented. *Id.* at 502. Jennings argued that her consent would be ineffective because if she did not consent, she would lose her job, which she could not afford to do. The court rejected her argument, however, because "[t]here cannot be one law of contracts for the rich and another for the poor." *Id.*

The balancing test is more consistent with Pennsylvania law than the approach taken by the Texas court in *Jennings.* Unlike the Texas courts, Pennsylvania's intermediate appellate courts have recognized a public policy exception to the employment-at-will doctrine on three occasions and have emphasized the need to examine all the circumstances in a wrongful discharge action, *Cisco,* 476 A.2d at 1343. Moreover, although two of those cases in part relied upon public policies expressed in statutes, the Pennsylvania courts have also recognized other sources as competent evidence of public policy. See page ——. More importantly, under Pennsylvania law an employee's consent to a violation of public policy is no defense to a wrongful discharge action when that consent is obtained by the threat of dismissal.[18]

■ In view of the foregoing analysis, we predict that the Pennsylvania Supreme Court would apply a balancing test to determine whether the Shop's drug and alcohol program (consisting of urinalysis and personal property searches) invaded Borse's privacy. Indeed, determining whether an alleged invasion of privacy is substantial and highly offensive to the reasonable person necessitates the use of a balancing test. The test we believe that Pennsylvania would adopt balances the employee's privacy interest against the employer's interest in maintaining a drug-free workplace in order to determine whether a reasonable person would find the employer's program highly offensive.[19]

■ We recognize that other jurisdictions have considered individualized suspicion and concern for safety as factors to be considered in striking the balance, see, for example, *Twigg,* 406 S.E.2d at 55 (allowing urinalysis based on individualized suspicion or when employee's job implicates safety concerns). We do not doubt that, in an appropriate case, Pennsylvania would include these factors in the balance, but we do not believe that the Pennsylvania Supreme Court would require private employers to *limit* urinalysis programs or personal property searches to employees suspected of drug use or to those performing safety-sensitive jobs.[20]

This precautionary note springs from two sources. First, these limitations originated in cases applying constitutional principles to urinalysis programs conducted by government employers. See *Skinner,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). We do not believe that the Pennsylvania courts would transfer the jurisprudence of the cases involving government employers to actions against private employers because the standard applied in cases involving government employers differs significantly from that applied in the tortious invasion of privacy cases. In the cases involving govern-

**18.** In *Leibowitz v. H.A. Winston Co.,* 342 Pa.Super. 456, 493 A.2d 111 (1985), plaintiff was fired after a polygraph test indicated that he lied about stealing money from his employer. Because plaintiff had signed a release prior to taking the polygraph test, however, his employer argued that he could not maintain a cause of action for wrongful discharge. The court disagreed. It noted that Pennsylvania law prohibits employers from requiring polygraph tests as a condition of employment and that discharging an employee for refusing to submit to a polygraph test violates public policy, see *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363 (3d Cir.1979) (upholding wrongful discharge action of employee fired for refusing to take polygraph test). The court then reasoned that although "mere economic or financial pressure [usually] does not suffice to invalidate a release," that rule does not apply when an employer requires an employee to sign a release as a condition of continued employment. 493 A.2d at 115. Un-

der those circumstances, the release is invalid. Accord *Polsky v. Radio Shack,* 666 F.2d 824 (3d Cir.1981) (applying Pennsylvania law). See Stephen M. Fogel, Gerri L. Kornblut, & Newton P. Porter, *Survey of the Law on Employee Drug Testing,* 42 U Miami L Rev 553, 669 (1988) (criticizing contrary result as creating Catch–22 for employee).

**19.** We note that this test differs from the test set forth in *Yaindl* (and later restricted in *Cisco* ). See pages —— – ——. The *Yaindl* test balances the employee's interest in earning a living against the employer's interest in running its business as it sees fit in order to determine whether the discharge violates public policy.

**20.** We note that these factors are not present in this case: there is no suggestion in any of the papers that Borse was suspected of using drugs or alcohol, or that her job as a salesperson implicated safety concerns.

ment employers, courts have asked whether the urinalysis program is reasonable under Fourth Amendment principles. In contrast, in order for an invasion of privacy to be tortious, it must be both substantial and highly offensive to the reasonable person. See Fogel, Kornblut, & Porter, 42 U Miami L Rev at 667 (comparing Fourth Amendment claim to tortious invasion of privacy claim). Therefore, even though our analysis at pages 621–24 reasons that if a private employer's drug and alcohol program tortiously invaded its employees' privacy, the Pennsylvania Supreme Court would hold that discharges related to that program violated public policy, we do not believe that the Pennsylvania Supreme Court would simply transpose Fourth Amendment limitations on public employers to urinalysis programs or personal property searches conducted by private employers.

Second, the case law concerning the public policy exception reflects "a pattern of favoring the employer's interest in running its business," *Turner*, 505 A.2d at 261, and a willingness to define that interest broadly. See, for example, *Cisco*, 476 A.2d at 1344 (discussing employer's interest). Given this backdrop, we find it unlikely that Pennsylvania would impose the strict limitations of the Fourth Amendment cases.

 In sum, based on our prediction of Pennsylvania law, we hold that dismissing an employee who refused to consent to urinalysis testing and to personal property searches would violate public policy if the testing tortiously invaded the employee's privacy. The sketchy nature of Borse's complaint makes it difficult for us to ascertain whether the Shop's drug and alcohol program would constitute a substantial and highly offensive intrusion upon Borse's privacy, however. Although she alleges that the program violates her right of privacy, she fails to allege *how* it does so. Because we can envision at least two ways in which an employer's drug and alcohol program might violate the public policy protecting individuals from tortious invasions of priva-

cy by private actors, see pages ——, ——, we will vacate the order of the district court dismissing the complaint, and we will remand the case to the district court with directions to grant Borse leave to amend.[21]

## SUR PETITION FOR PANEL REHEARING WITH SUGGESTION FOR REHEARING IN BANC

July 6, 1992.

Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO and ROTH, Circuit Judges.

The petition for rehearing filed by Appellant, having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges in active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is DENIED.

Judges Greenberg, Hutchinson, Nygaard and Alito would grant rehearing.

## STATEMENT SUR DENIAL OF REHEARING IN BANC

HUTCHINSON, Circuit Judge.

I respectfully dissent from the order denying rehearing in banc for the following reasons. In this diversity case, it is our duty to follow the substantive decisions of the highest court of the forum state, much as we are duty bound to follow the decisions of the Supreme Court of the United States. I believe the Court's conclusion that the Supreme Court of Pennsylvania would create a public policy exception to the employment-at-will doctrine in favor of private sector employees who refuse random drug tests is contrary to the decisional

---

**21.** Federal Rule of Civil Procedure 15(a) provides that "leave [to amend] shall be freely given when justice so requires." The Rule is construed liberally in order to further a basic purpose behind the Federal Rules—"that pleadings are not an end in themselves but are only a means to assist in the presentation of a case to enable it to be decided on the merits." 6 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure: Civil*

§ 1473 at 521 (West, 1990). An appellate court faced with an inadequate record may direct the district court to allow amendment on remand. See, for example, *National Post Office Mail Handlers v. United States Postal Service*, 594 F.2d 988, 991 (4th Cir.1979). Although leave to amend is rarely granted once a suit has reached an appellate court, we are particularly reluctant to foreclose a potentially meritorious claim where, as here, the law is unsettled.

law of that state's highest court on employment at will. The Court concedes that the public policy on which it relies is not expressed in either the Pennsylvania Constitution, Pennsylvania's statutory law or in existing Pennsylvania Supreme Court or Superior Court decisions concerning employment at will. This is a diversity case. Therefore, this Court is bound by state law. Judicial notions of public policy are no substitute for law. I am therefore unable to reconcile the Court's opinion with the requirement that federal courts follow state law in deciding diversity cases. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Pennsylvania case law demonstrates strict adherence to the doctrine of employment at will despite occasional dictum that there *may* exist undefined but narrow exceptions to that doctrine. Indeed, the Supreme Court of Pennsylvania has only recently reiterated its view that any public policy exception to the employment-at-will doctrine is extremely narrow. *See Paul v. Lankenau Hosp.,* 524 Pa. 90, 569 A.2d 346, 348–49 (1990). Its statement to that effect leads me to believe that specific exceptions should be created and defined by the Supreme Court of Pennsylvania. Until that court does so, I do not believe it is appropriate for a federal court to create an exception as important as the one announced here on a questionable analogy to the tortious invasion of privacy. That an employer may be liable in tort for invasion of privacy is not a basis for making it liable for wrongful discharge. The abstract existence of an action for invasion of privacy does not demonstrate that Pennsylvania would treat random drug testing in the private workplace as an invasion of privacy.

I see no indication anywhere in Pennsylvania's decisional law from which a strong policy favoring employee privacy *over* random drug testing could be inferred in the context of employment at will. No Pennsylvania court has even considered whether an employer's tortious invasion of an employee-at-will's privacy precludes discharge.

The decision of the United States District Court for the Western District of Pennsyl-vania in *Rogers v. International Bus. Machines Corp.,* 500 F.Supp. 867 (W.D.Pa. 1980), relied on by the Court is not to the contrary. There, an at-will employee was discharged because his relationship with a subordinate employee exceeded normal or reasonable business associations and the employee's conduct negatively affected the duties of his employment. On the wrongful discharge claim, the court rejected Rogers' argument that: .

> IBM's decision to terminate was improper because it was predicated on an investigation of a personal matter in which the Company had no legitimate interest and therefore invaded his right of privacy.

*Id.* at 869. It said:
> [A]n employer has a legitimate interest in "preserving harmony among its employees and in preserving its normal operational procedures from disruption."

*Id.* (quoting *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974)). I believe an employer has an unquestionably legitimate interest in monitoring and investigating its employees' use of illegal drugs.

I also believe that the Court gives an overly narrow reading to *Hershberger v. Jersey Shore Steel Co.,* 394 Pa.Super. 363, 575 A.2d 944 (1990), the case that is most analogous to the one before us. There, Hershberger argued that a public policy exists in Pennsylvania that precluding discharge of an employee who tests positively for illegal drugs unless drug use is confirmed by a second test. The Superior Court held that public policy did not provide a reason to recognize a cause of action for wrongful discharge based on positive results in a drug screening test that were not confirmed by a second testing procedure. *Id.* at 947. Hershberger relied on pending state legislation concerning confirmatory drug tests and federal and state decisions outside of Pennsylvania condemning the use of unreliable testing procedures. *Id.* at 947 & nn. 1 & 2. The state court nevertheless held, after considering the decisions from sister courts, that the pending legislation did not establish a " 'clear' mandate" strong enough to permit a common law court to create a cause of action for wrongful discharge by an employee at will.

Though *Hershberger* did not consider whether the public policy against invasion

of privacy precluded an employer from discharging an employee at will who tested positive for drugs, it did emphasize the necessity for a clear, strong expression of public policy before it would be appropriate to create a cause of action for wrongful discharge in the face of the Supreme Court of Pennsylvania's strict adherence to the doctrine of employment-at-will. I do not believe any such clear strong policy has been demonstrated here. Indeed, one might argue that there is a policy in favor of a drug-free workplace that is at least as strong as the right of privacy involved in random drug testing of private employees. Absent any federal or state constitutional or statutory prohibition against such testing, it seems to me it is the task of the Supreme Court of Pennsylvania, not this Court, in regulating employment practices within that state and to decide what relative strength these two competing public policies have.

The Supreme Court of Pennsylvania has historically been a strict enforcer of the right of an employer to discharge an employee at will for any reason, or no reason at all. It has recently restated its adherence to that view. Its insistence on the narrowness of any hypothetical exception to that right and the fact that no Pennsylvania case has granted relief from wrongful discharge to an employee at will convinces me that the Court's decision in this case that a private employee at will who is discharged for refusing a random drug test has a state cause of action for wrongful discharge because the test violated a public policy in favor of privacy that is not found in either federal or state constitutional law, federal or state statutory law or any decision of a Pennsylvania state court conflicts with *Erie*. Similarly, this Court's ability to "envision at least two ways in which an employer's urinalysis program might intrude upon an employee's seclusion," Op. at 622, does not, in my judgment, demonstrate the kind of strong public policy that permits us to overlook Pennsylvania's strong adherence to the doctrine of employment at will. Accordingly, I would grant the petition for rehearing in banc. Judges Greenberg and Alito join in this statement.