556 A.2d 878

**John J. McGONAGLE, Jr. and Carolyn M. Vella, his Wife, Appellees,**

**v.**

**UNION FIDELITY CORPORATION and Union Fidelity Life Insurance Company and First General Insurance Company, Appellants.**

Superior Court of Pennsylvania.

Argued Sept. 26, 1988.

Filed March 31, 1989.

Mark S. Dichter, Philadelphia, for Union Fidelity, appellants.

Stephen B. Harris, Warrington, for appellees.

Before KELLY, POPOVICH and HOFFMAN, JJ.

POPOVICH, Judge:

This case involves an appeal from the order (later reduced to judgment) of the Court of Common Pleas of Bucks County denying a motion for judgment n.o.v. by the defendants.[1]  We reverse.

1.  The defendants who have perfected an appeal to this Court, at least as appears from the face of the "Notice of Appeal", consist of Union Fidelity Corporation, the parent company of the other subsidiaries,

An appeal from the denial of a judgment n.o.v. requires that we examine the evidence, together with all reasonable inferences to be derived therefrom, in a light most favorable to the verdict-winner. See *Dallas v. F.M. Oxford, Inc.*, 381 Pa.Super. 89, 552 A.2d 1109 (1989). So viewed, the evidence reveals that John J. McGonagle, Jr., was hired by Union Fidelity Life Insurance Company as an Associate Counsel for Regulatory Affairs in April of 1980.

Union Fidelity Life Insurance Company was in the forefront of mass-marketing insurance via direct mail. It was a subsidiary of Union Fidelity Corporation, as were American Patriot Health Insurance Company and First General Insurance Company. All were owned by Filmways, Incorporated of California (Filmways).

In October of 1980, the plaintiff learned that the position of general counsel was to become vacant. He approached John M. Cooney to ask to be considered for the post. Cooney was the president of the insurance subsidiaries and the holding company, Union Fidelity Corporation. Because Cooney had "confidence" in the plaintiff, he was named acting general counsel. With the promotion, the plaintiff's responsibilities increased, *i.e.*, he was both an attorney and a manager for the organization. The plaintiff's rise in the corporate structure accelerated with his designation as general counsel two months later. By February of 1981, he was elevated to a vice-presidential post with Union Fidelity Life Insurance Company and he was named to the board of

defendants Union Fidelity Life Insurance Company, American Patriot Health Insurance Company and First General Insurance Company.

John M. Cooney, who was president of the insurance companies named, was included in the suit by the plaintiff under the theory that he "intentional[ly] and improper[ly] interfere[d] with Plaintiff's contractual relationship with Union Fidelity and its subsidiaries." Yet, the trial court granted the defendants' motion for a non-suit so that only the "wrongful discharge" issue was permitted to go to the jury for resolution, a count in the complaint which did not list Cooney as a party-opponent. Nonetheless, prior to the Court Clerk asking the foreperson to state the jury's verdict, he announced the names of the defendants, and Cooney was listed therein. Despite the aforesaid, this Court has no reason to think that Cooney is a party to the instant appeal inasmuch as his name is absent from the "Notice of Appeal" document.

directors. In the middle of March and the beginning of April of the same year, the plaintiff was named vice-president of First General Insurance Company and American Patriot Health Insurance Company. The job function and responsibilities were consistent with those performed at Union Fidelity Life Insurance Company, except no accompanying pay increase followed.

During the first three months of 1981, it was brought to the plaintiff's attention that Union Fidelity Life Insurance Company was not complying with various state insurance regulations. It appears that policies were about to be distributed ("mailed") in Utah when the plaintiff concluded that they were in contravention with that State's insurance specifications. The executive vice-president in charge of marketing, a Mr. Garvey, was advised of the situation. He summoned the plaintiff and other officials to his office to discuss the matter. Garvey was "quite significant" in the company's hierarchy in that his orders carried the weight of a directive from Cooney.

The plaintiff described Garvey at this meeting as "absolutely livid" over the prospect that the mailings might have to be stopped. Garvey told those present:

> ... we had damn well better get this straightened out or there would be blood on the floor by the end of the day and he didn't give a damn what it took.

If the matter were not resolved, Garvey threatened to "start firing people until he covered enough salary to cover the dollars that he was losing on the sale...." When asked by Garvey to authorize the mailings to Utah, considered by the plaintiff to be "illegal", McGonagle refused.

Other questionable insurance practices surfaced in New York, Minnesota, Connecticut and Pennsylvania. In the case of Pennsylvania and Utah, the plaintiff made the decision to cease the issuance of policies against applications he felt would be labelled as "illegal" by those jurisdictions. He did so even though he believed a delay in the issuance of the policies would have financial repercussions to Union Fidelity Life Insurance Company. Additionally,

the plaintiff decided that a continuation of Union Fidelity Life Insurance Company's practice of not honoring CAT scan claims would expose it to "unfair claims" charges, and, as a result, the procedure should cease.

The plaintiff never learned if or how the "policy-filing-problems" were resolved because on the 29th of April, 1981, he was called into Cooney's office and was told: "I want your resignation. It want you out of here." The plaintiff was "absolutely stunned" and inquired why he was being asked to leave. Cooney responded:

> I've had complaints from some of my officers about the quality of work in your department and the way you work with them. . . .

Also, Cooney informed the plaintiff:

> You're good enough that when Combined takes over I'll never be able to get rid of you and they will be happy with you here.

To put matters in perspective as to the role of "Combined" in this scenario, one needs to be made cognizant of the fact that Filmways, the parent company of Union Fidelity Corporation and its subsidiaries, had taken the initiative to divest itself of the insurance divisions and a processing center to cover its bank debts and to raise operating capital. In December of 1980, the plaintiff learned that the "buy-out" was to be accomplished by means of a stock-purchase-agreement between Filmways and Combined International Corporation.

In connection with the sale, Cooney and the Chairman of Filmways, Richard Bloch, established a "bonus pool" in which monies would be paid to Cooney and select members of his executive team (chosen by him) for services rendered. The amount to be paid was predicated upon the purchase price. "The higher the price, the more the bonus pool[.]"[2]

2. The final price for the sale came to 103.1 million dollars. Of this, Cooney was the recipient of $272.000 in "bonus" money, Mr. Wert (senior vice-president of marketing) received $13,000, Mr. Garvey was the beneficiary of $175,000, and Mr. Wise (chief of security) received $13,000 to $15,000.

The plaintiff also recounted how Cooney offered to rescind the dismissal if he could prove that the allegations of disenchantment from corporate personnel were "inaccurate". A meeting was set for 10:00 a.m. the next morning to evaluate the plaintiff's efforts. However, even after the plaintiff had spoken to the complainants, he was still perplexed as to the reasons for his firing, especially after Cooney advising him, at the end of February of 1981, that he would be made a vice-president, praised him at a luncheon with his colleagues as the "best person" for general counsel and presented him with an award acknowledging his corporate accomplishments. Other accolades were bestowed upon the plaintiff by Cooney, the substance of which need not be repeated except to note their contribution to the organization.

Against the background just painted, we are informed by the plaintiff of his arrival for the meeting with Cooney and being informed by the head of security that he was not allowed on the premises. As stated by the plaintiff:

I felt like I was under arrest. I mean I didn't believe this. I mean I left there the day before. I had an appointment with the President of the company at ten o'clock at his suggestion and I came—was coming for the appointment and I'm stopped out in the lot like I'm going to mug somebody and I see people and, people knew this is the head of security.

The head of security doesn't come out and stop somebody just to have a cup of coffee because they are a threat. Then I'm to be brought in [the building] and I have to be isolated. I absolutely couldn't believe it.

Ultimately, the plaintiff was permitted to enter the building and directed to wait in a "side office". Once head of security repeated that the plaintiff would have to leave, the plaintiff was able to contact Cooney by intercom. Cooney was reminded of the meeting but told McGonagle:

... I don't care. I don't want you bothering my officers. I don't care what I told you. I'm not going to see you.

After the plaintiff finished speaking to Cooney, he was escorted off the premises. Three or four days later, the plaintiff received approval to return to the office building to retrieve his belongings. He decided to do so during the evening hours so as not to be embarrassed as he had been previously. However, after he arrived he was denied, a second time, entry to his former office. Even though a box containing his property rested on a table next to the security guard, the plaintiff was told that he would have to return the next day during regular working hours. Nonetheless, it took calls from the plaintiff's attorney to secure authorization to return to Union Fidelity Life Insurance Company's office.

Additionally, the plaintiff reported a delay in the receipt of his unemployment compensation and the failure to have his insurance coverage extended through the non-feasance of Union Fidelity Life Insurance Company, as well as his "involuntary" termination not complying with the company's policy manual on personnel changes.

With the plaintiff's dismissal, a complaint was filed averring that his discharge was prompted by his efforts to have Union Fidelity Corporation and its subsidiaries cease violating the insurance laws of several states. Also, it alleged that his removal was wrongful as violative of a clear and compelling mandate of public policy and, therefore, was actionable under Pennsylvania law.

After a trial by jury, a verdict was returned in favor of the plaintiff ($30,000 on the wrongful discharge claim and an additional $32,000 in punitive damages). Once post-trial motions were denied,[3] the verdict was reduced to judgment and this timely appeal followed.

All parties concede that the only issue to be decided is whether McGonagle's loss of employment violated a public

---

3. Our review of the defendants' post-trial and supplemental motions and brief on appeal discloses the preservation of but one issue, i.e., the judgment n.o.v. question. All other issues and grounds proffered are held waived. See *Humphries v. Pittsburgh & Lake Erie Railroad Co.,* 328 Pa.Super. 119, 476 A.2d 919 (1984), cert. denied, 474 U.S. 863, 106 S.Ct. 179, 88 L.Ed.2d 149 (1985).

policy against the wrongful discharge of an employee-at-will.

We commence our inquiry by observing that employment-at-will has long been a major tenet of American contract law. *Novosel v. Nationwide Insurance Co.*, 721 F.2d 894, 902 (3rd Cir.1983). In Pennsylvania, at least since 1891, the established common law had been that, in the absence of a specific statutory or contractual restriction, an at-will employment contract could be terminated by either the employer or the employee at any time, for good reason, bad reason, or no reason at all. *Henry v. Pittsburgh & Lake Erie Railroad Co.*, 139 Pa. 289, 21 A. 157 (1891). The Pennsylvania courts began to reassess this rather rigid precept in 1974 with the Supreme Court's benchmark decision of *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974). Although declining to reverse the lower court's dismissal of the plaintiff's suit, the *Geary* Court acknowledged in *dicta* the possible existence of a nonstatutory cause of action for wrongful discharge:

> It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, *particularly where some recognized facet of public policy is threatened.* The notion that substantive due process elevates an employer's privilege of hiring and discharging his employees to an absolute constitutional right has long since been discredited. But this case does not require us to define in comprehensive fashion the perimeters of this privilege, and we decline to do so. We hold only that where the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship *and no clear mandate of public policy is violated thereby,* an employee at will has no right of action against his employer for wrongful discharge.

456 Pa. at 184, 319 A.2d at 180 (Footnote omitted; Emphasis added).

It is now well-settled in Pennsylvania that, "when the discharge of an employee-at-will threatens public policy, the employee may have a cause of action against the employer for wrongful discharge". *Yaindl v. Ingersoll–Rand Co.*, 281 Pa.Super. 560, 571, 422 A.2d 611, 617 (1980). The *sine qua non* to recovery is a showing that there has been a " 'violation of a clearly mandated public policy which "strikes at the heart of a citizen's social right, duties, and responsibilities." ' " *Paul v. Lankenau Hosp.*, 375 Pa.Super. 1, 14, 543 A.2d 1148, 1155 (1988) (en banc) (Citations omitted).

At bar, the plaintiff proffered the insurance laws in existence at the time of his dismissal as proof of the existence of a public policy violation. The plaintiff placed heavy emphasis on the reporting requirements of 31 Pa. Code Chapter 122.1, which provided:

Insurance companies doing business in this Commonwealth shall maintain a list of the following actions by the insurance department of any other state against the insurance company or by the insurance company against the insurance department of any other state, which involves any allegation of violation or possible violation of law, and which results in any of the following disposition:

1. Issuance of a court order or court adjudication, including a dismissal.

2. Issuance by the insurance department of a formal order requiring the insurance company to cease and desist from doing any specified act or practice.

3. Imposition of a fine or penalty against the insurance company.

4. Execution of a formal consent order or stipulation containing an admission of violation of law, a formal order or agreement to cease and desist from doing any specified act or practice, or a fine or penalty.

5. Company license revocation.

6. Company license suspension.

7. Company conservorship.[4]

---

**4.** The time-frame for reporting these actions appeared at 31 Pa.Code Chapter 122.2.

This regulation was repealed in 1986 and replaced with a system, updated and offered by the National Association of Insurance Commissioners to state insurance commissioners, whereby monthly reports provided the same information previously volunteered by an insurer. See *Pennsylvania Bulletin*, Vol. 16, No. 23 at page 2029 (June 7, 1986).

The plaintiff also relied upon 31 Pa.Code Sections 51.4 and 51.7, which provide:

### § 51.4. Advertising file.

(a) Each company shall maintain at its home or principal office a complete file containing every printed, published, or prepared advertisement of its individual contracts and typical printed, published or prepared advertisements of its blanket, franchise, and group contracts hereafter disseminated in this or any other state whether or not licenses in such other state.

(b) Each advertisement included in this advertising file shall be annotated as to the manner and extent of distribution and the form number of the contract advertised.

(c) The advertising file kept in accordance with the provisions of this section shall be subject to inspection by the Department.

(d) All advertisements and related material shall be maintained in said file for a period of either four years or until the filing of the next regular report of examination of the company, whichever is the longer period.

### § 51.7. Sanctions.

Failure to properly file or maintain material, in accord with the requirements of this Chapter shall constitute a refusal to produce or maintain records as required by the Department, and shall subject any individual or company so failing to all the appropriate sanctions provided by law.

Lastly, the plaintiff directs us to 40 Pa.S. Section 437, which reads in pertinent part:

... Any person chosen, either annually or to fill a vacancy, as president, secretary, treasurer or for any other office provided for in the by-laws, shall continue to serve in such office unless the insurance commissioner, after

such investigation as he deems proper, shall determine that the responsibility, character, and general fitness for the business, of such individual are not such as to command the confidence of the public, and to warrant the belief that the business of the company will be honestly and efficiently conducted in accordance with the intent and purpose of this act. . . .

It is the plaintiff's contention that the cited material embodies the public policy of this Commonwealth, and, as such, he was "compelled" to comply with its intent and purpose. In other words, his actions within the insurance company, to make certain that the business complied with the laws and regulations of all the states in which the company operated, were "required as a matter of public policy by Pennsylvania, because the general fitness for the insurance business and financial health of defendant insurance companies depended not just on the business it did in Pennsylvania but on the sum total of its business in this and other states."

The plaintiff makes reference to no case supportive of his position that his job was terminated because he attempted to fulfill the responsibilities expressed in the previously quoted regulations and statute. While there is no Pennsylvania case squarely on point, we believe that the clear direction of the opinions in this area of the law suggest the absence of a recognized and significant public policy violation, and this, in turn, dispenses with the need to inquire into whether the defendants had a justifiable reason for firing the plaintiff. See *Yaindl v. Ingersoll-Rand Co.*, supra, 281 Pa.Super. at 577, 422 A.2d at 620; see also *Turner v. Letterkenny Federal Credit Union*, 351 Pa.Super. 51, 505 A.2d 259 (1985).

In the cases we have examined, a wrongful discharge cause of action has been sustained where it is rooted in an important and well-recognized facet of public policy. For example, in *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980), the plaintiff/employee was hired for an indefinite term as a quality control director and

operations manager of the defendant, Teddy's Frosted Foods, Inc. The plaintiff began to notice deviations from the specifications contained in the defendant's standards and labels for vegetables and meat components which went into making its products. These deviations also constituted violations of the Connecticut Uniform Food, Drug and Cosmetic Act (Act). The plaintiff wrote the defendant concerning the use of substandard materials. His recommendations were ignored and he was fired shortly thereafter.

The Connecticut court concluded that the lower court's grant of the defendant's motion to strike (equivalent to a demurrer) was error. Because the Act was intended to protect the health and welfare of the public from produce use and merchandising deceit, the plaintiff acted to protect the public's safety and himself from criminal sanction. As such, the case was remanded to allow the plaintiff to pursue his wrongful discharge suit.

In *Perks v. Firestone Fire & Rubber Co.*, 611 F.2d 1363 (3rd Cir.1979), a dismissal for failure to take a polygraph test was held to violate public policy since such testing, as a condition of employment, was proscribed by the Pennsylvania Crimes Code, 18 Pa.C.S. § 7321. Consistent therewith, a discharge of an employee for his responding to a notice of jury duty was held violative of a clear mandate of public policy in *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119, 121 (1978) (Pa. Const. art. I, § 6; 17 P.S. § 1099). Accord *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975). Continuing, in *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973), the Supreme Court of Indiana reversed the trial court's dismissal of a complaint alleging the plaintiff was discharged for filing a workmen's compensation claim. Further, a replacement of an employee for her refusal to sell liquor to a visibly intoxicated person was violative of the Pennsylvania Liquor Code and the predicate for the tort of wrongful discharge. See *Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699, 702 (3rd Cir.1988). Also, in *Novosel,* supra, the removal of an employee for his unwillingness to participate in the

company's lobbying efforts was held to concern, under Pennsylvania law, the right to political expression and association entitled to protection. Likewise, in *Hunter v. Port Authority of Allegheny County*, 277 Pa.Super. 4, 419 A.2d 631 (1980), an applicant's denial of work for his failure to disclose a 13–year–old misdemeanor count, for which he had been unconditionally pardoned, entitled him to a cause of action for wrongful refusal to hire. But see *Cisco v. United Parcel Services Inc.*, 328 Pa.Super. 300, 476 A.2d 1340 (1984). Finally, in *Petermann v. International Brotherhood of Teamsters*, 174 Cal.App.2d 184, 344 P.2d 25 (1959), the court permitted a cause of action for an employee's dismissal for refusal to commit perjury.

In contrast, where the public policy claimed to be violated is not "clear", a cause of action for wrongful discharge has not been recognized. For instance, in *Callahan v. Scott Paper Co.*, 541 F.Supp. 550 (E.D.Pa.1982), the plaintiffs alleged they were discharged by Scott in retaliation for their objection to, expression of and efforts to eliminate the illegal price discounts and promotional allowances which Scott extended to certain favored customers.

The *Callahan* court, albeit labelling the efforts of the plaintiffs as "praiseworthy" in redirecting what they perceived to be unlawful activity (in the anti-trust field) by Scott, concluded that, "the employer's interest [was] paramount where the employee object[ed] to pricing decisions of his employer on the ground that they cause harm to competition." 541 F.Supp. at 563 (Citations omitted).

In *Yaindl*, supra, an employee's discharge for bringing to the company's attention defects in the manufacturing of pumps for an overseas company was held not to constitute a contravention of any stated public policy. A claim that the pumps posed a "safety hazard" was unsubstantiated. Moreover, there was no evidence that the company attempted to hide the defects in the pumps, or deny its responsibility. Accord *Adams v. Budd Co.*, 583 F.Supp. 711 (E.D.Pa. 1984).

Furthermore, in *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980), and *Lampe v. Presbyterian Med. Center*, 41 Colo.App. 465, 590 P.2d 513 (1978), each complainant pointed to a statute or professional code of ethics as reflective of the "public policy" violated with his/her dismissal. The courts decided otherwise in holding that the basis for the public policy claim was too vague and lacking in specifics to mount up to a *prima facie* showing that the claimed misconduct on the part of the employer violated the public policy of the states. See *Adler* (Md.'s criminal code and claims of commercial bribery and falsification of corporate records were too vague), *Pierce* (medical doctor's refusal to continue to work on development of product claimed to be violative of Hippocratic Oath did not identify a specific expression of public policy), and *Lampe* (statute containing general principles pertaining to the licensing of plaintiff's profession (nursing) did not create a cause of action).

In this Commonwealth, a case-by-case analysis has been adopted in reviewing a wrongful discharge cause of action. See *Rossi v. Pennsylvania State Univ.*, 340 Pa.Super. 39, 43–48, 489 A.2d 828, 831–32 (1985). Such an approach is apropos here since this case focuses on the special considerations arising out of the right to fire an employee at-will who is a member of a recognized profession. In this context, it is worth mentioning that the responsibilities confronting a professional employed by a large corporation may, on occasion, conflict; to-wit:

Consider, for example, the plight of an engineer who is told that he will lose his job unless he falsifies his data or conclusions, or unless he approves a product which does not conform to specifications or meet minimum standards. Consider also the dilemma of a corporate attorney who is told, say in the context of an impending tax audit or antitrust investigation, to draft backdated corporate records concerning events which never took place or to falsify other documents so that adverse legal conse-

quences maybe avoided by the corporation; and the predicament of an accountant who is told to falsify his employer's profit and loss statement in order to enable the employer to obtain credit.

Blades, *Employment At Will vs. Individual Freedoms: On Limiting the Abusive Exercise of Employer Power,* 67 Colum.L.Rev. 1404, 1408–09 (1967).

■ An employee who is also a professional has a dual obligation: to abide by federal and state laws, in addition to staying within the bounds of his/her professional code of ethics. Such responsibility may necessitate that the professional forego the performance of an act required by his/her employer. *Pierce,* supra. However, when the act to be performed turns upon a question of judgment, as to its legality or ethical nature, the employer should not be precluded from conducting its business where the professional's opinion is open to question. *Id.*

■ Instantly, it was the position of the defendants that the "policy filing problems" were minor in nature and easily reconciled without the loss of revenue or the contravention of any state's insurance requirements, a matter we find to be more akin to a difference of opinion and not a request to have the plaintiff perform an "illegal" or unethical act in furtherance of corporate profits.

It is true that unjust dismissal continues to be a substantial problem for the nearly seventy million employees who are neither civil servants nor union members. Comment, *Protecting Employees At–Will Against Wrongful Discharge: The Public Policy Exception,* 96 Harv.L.Rev. 1931, 1934 (1983). However, this Court is bound by Pennsylvania law as to what constitutes a wrongful discharge. *Adams,* supra. It is obvious from all the cases reviewed, unless an employee identifies a "specific" expression of public policy violated by his discharge, it will not be labelled as wrongful and within the sphere of public policy.

As with *Adler,* supra, *Pierce,* supra, and *Lampe,* supra, we read the regulations and statute presented by the plain-

tiff, to buttress his public policy argument, to be no more than a "general" expression of this Commonwealth's attempt to monitor a particular industry. This point is consistent with the plaintiff's characterization of the insurance laws of this Commonwealth as being purely "voluntary" in nature.

The provisions recited by the plaintiff lack specificity as to what conduct is proscribed. Although "informative" as to the consequences which may befall an individual or insurance company for failing to act, the regulations are devoid of "substance" as to what conduct exposes one to a penalty and/or fine, save for the retention of a file on advertising information not herein dispositive of the issue under examination.

Albeit the plaintiff makes reference to various "policy-filings" not comporting with certain states' insurance procedures, he neglects to list those statutes or regulations. We are left with only his opinion as to such conduct being ("qualitatively") violative of a state's unspecified insurance laws. We do not equate such broad and general statements of policy violations to be tantamount to *Geary's* "clear mandate of public policy which strikes at the heart of a citizen's social right, duties and responsibilities" entitled to the status of a nonstatutory cause of action.

Judgment reversed and case remanded for entry of judgment in favor of the defendants. Jurisdiction is relinquished.

KELLY, J., joins and files a concurring statement.

KELLY, Judge, concurring:

I join in the majority opinion. I note, however, that I do not read the majority opinion to adopt, as binding on this Court, any of the specific holdings of the various decisions of our sister states and the federal courts cited as to what may or may not be a public policy of this Commonwealth. Rather, I read the majority opinion to emphasize the importance of clear evidence of the existence of a particular

public policy, a clear breach of the public policy, and a substantial nexus between the public policy violated and the challenged termination of an employee's at-will employment.

Neither the existence nor the violation of a public policy were established in this case.