**Silvana RIGGIO, M.D., Appellant,**

v.

**Rosalie A. BURNS, M.D., Lawrence Brown, M.D., and Medical College of Pennsylvania, Appellees.**

Superior Court of Pennsylvania.

Argued Nov. 25, 1997.

Filed March 30, 1998.

James J. McHugh, Jr., Philadelphia, for appellant.

Mary E. Kohart, Philadelphia, for appellees.

Before McEWEN, President Judge, CAVANAUGH, J., CIRILLO, President Judge Emeritus, and TAMILIA, POPOVICH, JOHNSON, HUDOCK, FORD ELLIOTT and EAKIN, JJ.

HUDOCK, Judge:

This is an appeal from the order of the trial court granting summary judgment in favor of Rosalie A. Burns, M.D. (Dr. Burns), Lawrence Brown, M.D. (Dr. Brown), and the Medical College of Pennsylvania (MCP), (collectively Appellees). We granted *en banc* review to determine the applicability of the Pennsylvania Whistleblower Law, 43 P.S. sections 1421–1428, to a private medical institution which receives some funding from the Commonwealth. For the following reasons, we affirm the order granting summary judgment, albeit on grounds different from those relied upon by the trial court. *See, e.g., Smith v. Smith,* 439 Pa.Super. 283, 653 A.2d 1259 (1995).

The facts and procedural history may be summarized as follows: Appellant is a neurologist who was employed as an instructor in the Neurology Department at MCP. From January 1990, to June 1991, she served as Surgical Director and Associate Director for MCP's Mid–Atlantic Regional Epilepsy Center (MAREC). During this time Dr. Burns was the Chairman of the Department of Neurology at MCP. Dr. Brown was the Director of Pediatric Neurology at MAREC from 1989 until May of 1991, when he became the Director of MAREC. On July 1, 1991, Appellant was reappointed "without tenure" to the MCP faculty through June 30, 1992.

Dr. Burns terminated Appellant's employment in February of 1992, citing failure to follow departmental leave procedure as the cause. Appellant asserts that the reason stated was clearly pretextual and that her termination resulted from the following events: In 1990, several MAREC patients were referred to MCP's Department of Neurology for epilepsy surgery, wherein electronic strips, or depth electrodes, were to be placed in or over the brains of the patients. Although H. Warren Goldman, M.D. (Dr. Goldman), Chief of Neurosurgery, was the supervising surgeon for these procedures, he was not physically present while residents *actually* inserted the electrodes. One of the patients died and another lapsed into a coma as a result of these procedures.

Appellant and Richard N. Harner, M.D. (Dr. Harner), Director of MAREC at the time and Vice Chair of MCP's Department of Neurology, vigorously opposed Dr. Goldman's definition of "supervision" and demanded that he either personally perform all future epilepsy surgeries, or that he be physically present to supervise the residents. Dr. Goldman twice provided assurances that he would conduct future surgeries in compliance with these demands. However, shortly after each promise, Dr. Goldman again permitted residents to place the electrodes while he was not physically present in the operating room. On November 23, 1990, Appellant and Dr. Harner sent a letter to Harry Gottlieb, M.D. (Dr. Gottlieb), Vice President of Clinical Affairs at MCP, in which they specifically outlined their objections to Dr. Goldman's activity.

Following a meeting between Dr. Goldman, Dr. Gottlieb, and Dr. Harner, Dr. Goldman agreed to personally perform the surgeries until such time as he and the neurologists could agree on guidelines governing the residents' participation. Thereafter, several meetings were held in which Dr. Harner and Dr. Goldman exchanged drafts of proposed surgical guidelines. The doctors were unable to reach an agreement with respect to (1) whether Dr. Goldman must be physically present during the surgeries; and (2) whether only residents who had attained the later stages of their residency would be permitted to operate. Because an agreement could not be reached, and because Dr. Goldman had again permitted a resident to operate while he was not physically present, Dr. Gottlieb and Dr. Burns decided to stop the surgical component of the epilepsy program.

On May 13 and 14, 1991, respectively, Dr. Harner and Appellant resigned from their respective positions at MAREC, but retained their other positions at MCP. On July 1, 1991, Appellant was informed that she would not be reappointed to MCP's faculty for the year commencing July 1, 1992. Dr. Harner then completely resigned from MCP on December 31, 1991. In January of 1992, after accepting an offer for employment at the Mayo Clinic, Appellant notified Dr. Burns

that she also was resigning from MCP, to be effective in March of 1992. However, in February of 1992, Appellant was terminated from MCP for allegedly failing to follow departmental leave procedure in relation to a medical conference she had attended in California.

On July 19, 1992, Appellant filed an amended complaint, asserting the following claims against all Appellees: breach of contract (Count I), wrongful discharge based upon an intent to harm (Count II), intentional infliction of emotional distress (Count III), defamation (Count IV), invasion of privacy (Count V), interference with present or future contract advantages (Count VI), violation of the Pennsylvania Whistleblower Law (Count VII), false light publicity (Count VIII), and wrongful discharge based upon a violation of public policy (Count IX). Upon completion of discovery, Appellees moved for summary judgment on all counts except the breach of contract claim against MCP. On October 11, 1995, the trial court granted summary judgment and dismissed all of Appellant's claims except the breach of contract claim against MCP (Count I), and the defamation claim (Count IV) against Dr. Brown only. The order was made final by a praecipe to discontinue the breach of contract and defamation claims. *See* Pa.R.A.P. 341, 42 Pa.C.S.A. This appeal followed wherein Appellant seeks *en banc* review solely with respect to her claim under the Pennsylvania Whistleblower Law.

When determining whether a trial court properly entered summary judgment, this Court's scope of review is plenary. *Schriver v. Mazziotti,* 432 Pa.Super. 276, 638 A.2d 224, 225 (1994). Summary judgment is granted when the record demonstrates that there exists no genuine issue of material fact. Pa. R.C.P. 1035(b), 42 Pa.C.S.A.[1] We must examine the entire record in the light most favorable to the non-moving party and resolve all doubts against the moving party when determining if there is a genuine issue

of material fact. *Schriver,* 638 A.2d at 225. We will reverse an entry of summary judgment only if the trial court commits an error of law or abuses its discretion. *Accu–Weather, Inc. v. Prospect Communications, Inc.,* 435 Pa.Super. 93, 644 A.2d 1251, 1254 (1994).

In Count VII of her amended complaint, Appellant claimed that her employment was terminated in violation of the Pennsylvania Whistleblower Law. Appellees moved for summary judgment as to Count VII based upon the following: (1) Appellant was not an "employee"; and (2) she did not report a "wrongdoing", as these terms are defined by the Whistleblower Law. The trial court dismissed Appellant's claim, concluding that because MCP was not a "public body", she could not be considered an employee under the statute.

The Whistleblower Law provides, *inter alia,* that "[n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee ... because the employee ... makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste." 43 P.S. § 1423(a). "Employee" is defined as "[a] person who performs a service for wages or other remuneration under a contract of hire ... for a public body." 43 P.S. § 1422.

Because the Whistleblower Law applies only if Appellant was an employee of a public body, we must first determine whether MCP may be considered such an entity under the statute. A "public body" is defined, in relevant part, as "[a]ny ... body which is created by Commonwealth or political subdivision authority *or which is funded in any amount by or through Commonwealth or political subdivision authority* or a member or employee of that body." *Id.* (emphasis added). In response to Appellant's interrogatories, MCP admitted to the receipt of yearly appropriations from the Commonwealth of Pennsylvania.[2]

---

1. We recognize that Pa.R.C.P. 1035 has been recently replaced by Pa.R.C.P. 1035.1–1035.5, effective July 1, 1996. Because the instant order was entered on October 20, 1995, the new rules are not applicable.

2. In fact, our legislature appropriated over $4.5 million to "The Medical College of Pennsylvania located in East Falls, Philadelphia," for the fiscal year July 1, 1990 to June 30, 1991. 1990 Pa. Laws Act 1990–20A. There is no dispute that

Nevertheless, Appellees aver that such appropriations cannot render MCP a public body for purposes of the Whistleblower Law. Appellees argue that finding MCP to be a public body is an absurd result, which could not have been intended by the legislature. In support of their assertion, Appellees attempt to find ambiguity in the legislature's use of the term "funded," since this term is not defined within the statute. It appears that Appellees' argument derives from language in *Cohen v. Salick Health Care, Inc.*, 772 F.Supp. 1521, 1527 (E.D.Pa.1991), wherein the United States District Court for the Eastern District of Pennsylvania considered a much more complicated question from that which presents itself instantly. After commenting that "[i]t is clear that the legislative intent was to make the law applicable to bodies that receive even one dollar of state funding," the court indicated that the legislative history was silent as to what was meant by "funded." *Cohen*, 772 F.Supp. at 1526 (*citing* Pa.Legis.J.–House, June 18, 1985, pp. 1230–32, 1277).

The issue in *Cohen* was whether the following amounted to funding by or through the Commonwealth: The defendant was a publicly owned, for-profit corporation, which was incorporated in the State of California and contractually affiliated with Temple University regarding the operation of a cancer treatment center in Philadelphia. The center treated Medicaid-eligible patients and billed the Commonwealth through Temple University. The Medicaid reimbursement was then remitted to Temple, which in turn paid the defendant a certain amount representing payment for services rendered.

The *Cohen* court held that such an arrangement did not constitute funding by or through Commonwealth authority, and that, therefore, the defendant was not a public body under the Whistleblower Law. Even if we were bound by this decision, which we are not, the issue of whether Medicaid reimbursements constitute funding is not before us. In this case, MCP acknowledges, as it must, that it received specific appropriations from the General Assembly of this Commonwealth. A more direct and patent form of funding is difficult to imagine.

Appellees claim that finding MCP to be a public body simply because it received state appropriations would be an absurd result because it would "warp the plain meaning of the term 'public body'" to include all otherwise private entities that receive state appropriations. Appellees' Substituted En Banc Brief at 15. Consequently, Appellees assert, thousands of such entities would unexpectedly be subject to the Whistleblower Law. However, an attempt to divine the intent of the legislature by reference to the common understanding of "public body" is not only unnecessary, it also begs the question. Notwithstanding the everyday meaning of "public body", this term was expressly defined by our legislature for purposes of the Whistleblower Law. "Where a statute provides internal definitions, we are bound to construe the statute according to those definitions." *Hodges v. Rodriguez*, 435 Pa.Super. 360, 645 A.2d 1340, 1348 (1994) (*citing* 1 Pa.C.S.A. § 1903(a)).

■ The statute plainly and unequivocally makes any body "funded in any amount by or through Commonwealth ... authority" a public body for purposes of the Whistleblower Law. 43 P.S. § 1422. Where the language of a statute is unambiguous on its face, we are bound to give effect to that language. 1 Pa.C.S.A. § 1921(b). Parenthetically, we note that it is not unreasonable for the legislature to condition the receipt of state funds on the acceptance of the responsibilities embodied in the Whistleblower Law. Accordingly, as MCP was clearly funded by the Commonwealth, we find it to be a public body as defined by the statute. Thus, the Whistleblower Law applies to Appellant as an employee of a public body.

■ We must now determine whether the action taken by Appellant qualifies as a report of "wrongdoing," entitling her to the protection of the Whistleblower Law.[3]

---

*Appellant was employed at MCP's East Falls location.*

**3.** Appellant misrepresents that Appellees moved for summary judgment on the sole ground that MCP was not a public body and that Appellees "posited an entirely new argument" on appeal.

"Wrongdoing" is defined as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 P.S. § 1422.

Appellant contends that she clearly reported a wrongdoing under the statute because she was objecting to surgical procedures, which placed patients' safety in jeopardy. Consequently, Appellant asserts, her complaints were in relation to activity that completely disregarded the legal and ethical duties placed upon all health care providers. "[S]uch duties are expressed not only in the various ethical codes promulgated by State and local medical societies, but by statute." [4] Appellant's Substituted En Banc Brief at 24. In support of her assertion, Appellant directs our attention to the Health Care Facilities Act, 35 P.S. sections 448.101–448.904, which sets minimum licensing standards for health care facilities. Appellant notes that Section 448.808 provides that a license shall issue to a health care provider when the Department of Health is satisfied, *inter alia*, "that the health care facility provides safe and efficient services which are adequate for the care, treatment and comfort of the patients or residents of such facility." 35 P.S. § 448.808(a)(3). Additionally, the department may refuse to renew a license or may suspend or revoke a license due to "[i]ncompetence, negligence or misconduct in operating the health care facility or in providing services to patients." 35 P.S. § 448.811(7).

As further support for her position, Appellant cites the Medical Practices Act of 1985, 63 P.S. sections 422.1–422.45, establishing the licensing standards for medical practitioners. Section 422.41 provides that the State Board of Medicine may impose disciplinary or corrective measures on a medical practitioner for "failing to conform to an ethical or quality standard of the profession," which is defined as "when the practitioner provides a medical service at a level beneath the accepted standard of care," or "[a]cting in such manner as to present an immediate and clear danger to public health or safety." 63 P.S. §§ 422.41(8)(ii), 422.41(9).

Appellant avers that she comported with, and was in fact compelled by, these licensing statutes to prevent future occurrences of epilepsy surgery performed by unsupervised residents. We do not doubt the good faith of Appellant's belief that Dr. Goldman's practice of permitting residents to place depth electrodes while he was not physically present constituted conduct which fell below an acceptable standard of medical care. And while we admire Appellant's dedication to what she believed to be a good cause, we are constrained to hold that she has not presented a cognizable claim under the Whistleblower Law.

The regulatory statutes cited by Appellant are entirely too general and vague to permit the conclusion that a violation had occurred amounting to "wrongdoing" under the Whistleblower Law. Both the Health Care Facilities Act and the Medical Practices Act of 1985 provide only general requirements for the licensing of health care facilities and physicians. For example, within one of the sections Appellant cites, it is provided that the Department of Health shall issue a license to a health care provider when it is satisfied "that the health care provider is a responsible person." 35 P.S. § 448.808(a)(1). Similarly, another section states that a physician may be subject to disciplinary measures for "[b]eing guilty of immoral or unprofessional conduct." 63 P.S. § 422.41(8). Because standards such as these are subject to interpretation, and do not specifically define prohibited conduct, it is not at all clear when they would be violated in such a way as to amount to "wrongdoing".

This observation is equally true of the sections emphasized by Appellant: Whether

---

Our review of the record reveals that Appellees' summary judgment motion also specifically averred that Appellant failed to establish that she reported a "wrongdoing" under the statute.

**4.** Beyond this general reference to "various ethical codes", Appellant offers no further identification of a code of ethics or conduct which she believed had been violated. *See generally Surmacz v. Department of Public Welfare,* 148 Pa. Cmwlth. 585, 612 A.2d 566 (1992) ("code" under the Whistleblower Law requires at least a written document).

an individual physician or a health care facility has acted in a manner which is incompetent, negligent or below the requisite standard of care, or which presents a danger to public safety, are questions which involve differences of medical opinion. The facts of this case are illustrative: Dr. Goldman was of the opinion that proper supervision of the residents required only that he be present during certain portions of the procedures, and that he be immediately available to assist during others. Appellant was of the contrary belief that Dr. Goldman should be physically present for the entire surgery. Subsequent to Appellant's initial complaint,[5] Dr. Goldman agreed to personally perform future surgeries until an agreement could be reached regarding proper supervision. After Dr. Goldman breached this promise, MCP suspended the epilepsy surgery program until such an agreement could be reached. Appellant was discharged more than a year later, at which time no agreement had been reached and no further surgeries had been performed.

Viewing these facts most favorably to Appellant, it appears that the question of what constituted proper supervision involved a difference of medical opinion. In this regard, we find this Court's reasoning in the wrongful discharge context persuasive:

> An employee who is also a professional has a dual obligation: to abide by federal and state laws, in addition to staying within the bounds of his/her professional code of ethics. Such responsibility may necessitate that the professional forego the performance of an act required by his/her employer. However, when the act to be performed turns upon a question of judgment, as to its legality or ethical nature, the employer should not be precluded from conducting its business where the professional's opinion is open to question.

*McGonagle v. Union Fidelity Corp.*, 383 Pa.Super. 223, 556 A.2d 878, 885 (1989) (citations omitted).

■ Assuming, arguendo, that Dr. Goldman's activity constituted negligent or incompetent conduct,[6] Appellant would still not be entitled to protection under the Whistleblower Law. Wrongdoing, as defined by the Whistleblower Law, does not encompass tort principles unless a statute, regulation, or code of conduct or ethics is violated by the tortious act or omission. *See* 43 P.S. § 1422, *supra.* Appellant attempts to come within the purview of the Whistleblower Law by claiming that Dr. Goldman's conduct violated the licensing statutes. However, the licensing statutes are of no assistance to Appellant because they lack specificity as to what acts are proscribed. The statutes merely consist of the legislature's guidelines for the regulation of the health care industry. Each statute delegates to an independent entity the power to investigate and evaluate whether the individual in question has complied with these general standards.[7] They then provide that certain consequences may be imposed if the entity determines that the standards have not been met. The statutes are utterly silent with respect to specific conduct. Because the statutes cited by Appellant do not comment on the issue of when a surgeon must be physically present while a resident engages in surgical procedures, we cannot conclude that they have been violated in such a manner as to constitute "wrongdoing" as defined by the statute.[8]

In a final attempt to establish wrongdoing, Appellant notes a Medicare regulation in effect at the time stating, in pertinent part, that in order for a hospital to receive Medicare reimbursement for a major surgical procedure performed by a resident, the attend-

---

5. Drs. Burns and Brown joined in Appellant's initial complaint to MCP.

6. Appellant avers that because Drs. Burns and Brown opposed Dr. Goldman's definition of supervision as "unacceptable," it is conclusively established that Dr. Goldman's conduct was below the requisite standard of care. For the reasons expressed *infra,* we do not decide this issue.

7. This function is performed by the Department of Health under the Health Care Facilities Act and the State Board of Medicine under the Medical Practices Act of 1985. *See supra.*

8. As noted previously, Appellant does not direct our attention to any code of ethics or conduct that would require a surgeon to be physically present with a resident under these or any circumstances.

ing physician must supervise the procedure in person. 42 C.F.R. § 405.521 (1990). Although the procedures presently in question were undoubtedly "major surgery," the regulation provides little support for Appellant's claim. The regulation merely advised of the conditions under which Medicare would reimburse teaching hospitals for surgical procedures. It neither created a duty to supervise in person nor prohibited surgery in the absence of such personal supervision. Therefore, the regulation simply could not be *violated* as contemplated by the Whistleblower Law.

Order affirmed.

CAVANAUGH, J., and CIRILLO, President Judge Emeritus, file concurring opinions.

McEWEN, President Judge, files a concurring and dissenting statement.

CIRILLO, President Judge Emeritus, concurring:

Because I believe that the Medical College of Pennsylvania ("MCP") was not "funded" by the Commonwealth, as intended under the Whistleblower Law (43 P.S. §§ 1421, *et seq.*), I must concur.

It is well settled that generally there is no common law action against an employer for termination of an at-will employment relationship. *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974). There are, however, exceptions to this rule; the exceptions are purposely and carefully limited to instances where discharging an at-will employee would threaten clear mandates of public policy. *Id. See Field v. Philadelphia Elec. Co.*, 388 Pa.Super. 400, 565 A.2d 1170 (1989) (employee recovered under public policy exception to at-will doctrine where employee was hired as expert in nuclear safety and was subsequently discharged for making statutorily required report to Nuclear Regulatory Commission); *Hunter v. Port Auth.*, 277 Pa.Super. 4, 419 A.2d 631 (1980) (denying employment to individual who had been pardoned for assault conviction violated public policy of guaranteeing an individual's state constitutional right to engage in common occupations); *Reuther v. Fowler & Williams*

*Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978) (interference with at-will employee's statutory duty to serve on jury violated public policy). Additionally, our legislature has enacted the Whistleblower Law ("the Law"), 43 P.S. §§ 1421 *et seq.*, a statutory remedy for at-will employees terminated from entities that receive funding from Commonwealth or political subdivision authority. This Law, however, does not protect employees who have been discharged from private entities; only public sector employees fall within the statute's ambit and intent. *Krajsa v. Keypunch, Inc.*, 424 Pa.Super. 230, 622 A.2d 355 (1993). *See Clark v. Modern Group Ltd.*, 9 F.3d 321 (3d Cir.1993); *see also Wagner v. General Electric Co.*, 760 F.Supp. 1146 (E.D.Pa.1991) (by enacting 43 P.S. §§ 1421 *et seq.*, the legislature clearly intended to exclude employees' "whistleblowing" claims against private sector employers).

While recognizing the import of the Whistleblower Law and its value to employees discharged from the public sector for retaliatory purposes, I find the instant case an appropriate opportunity to express the need to limit the application of this statute. Presently MCP acknowledges that the hospital received appropriations from the Commonwealth. The receipt of such monies, however, should not subject MCP to potential statutory liability under this state's whistleblower law. To hold otherwise would extend the application of the Law well beyond its intended purpose—a decision that I cannot sanction.

The Whistleblower Law was enacted to statutorily protect public employees from employer retaliation when those employees have made good-faith efforts to alert authorities to governmental waste and wrongdoing. *Krajsa, supra; Rodgers v. PA. Dept. of Corrections*, 659 A.2d 63 (Pa.Commw.1995). *See also* 43 P.S. § 1421, *Historical and Statutory Notes* (the act provides for protection for employees who report a violation or suspected violation of State, local, or Federal law). The Law was not intended to fall within the narrow public policy exception to the at-will employment doctrine. *Brown v. Hammond*, 810 F.Supp. 644 (E.D.Pa.1993). The Law provides, in part, that:

No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 P.S. § 1423(a).

An employer is defined under the Law as "[a] person supervising one or more employees, including the employee in question; a superior of that supervisor; or an agent of a public body." 43 P.S. § 1422. Furthermore, this statute defines an employee as "[a] person who performs a service for wages or other remuneration under a contract of hire, written or oral, express or implied, for a public body." *Id.*

A "public body" is defined, in relevant part as:

Any other body which is created by Commonwealth or political subdivision authority or which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body.

43 P.S. § 1422 (emphasis added).

The issue involved in this case is whether the Medical College of Pennsylvania constitutes a "public body" under the Pennsylvania Whistleblower Law due to the monies it received from the Commonwealth. Because there have been no state superior or supreme court decisions directly on point with this statutory issue, I am guided by the legislative interpretation of the Whistleblower Law as annunciated in *Cohen v. Salick Health Care Inc.*, 772 F.Supp. 1521 (E.D.Pa. 1991).

In *Cohen*, the plaintiff was an employee of Salick Health Care Inc., a publicly-traded, for-profit corporation that operated and managed out-patient cancer treatment centers throughout the nation. In September of 1988, Temple University contracted with Salick to operate and manage a cancer center in North Philadelphia. In a management agreement signed by both parties, Salick and Temple contracted that it would be regarded as an independent contractor of Salick. During the course of her involvement with the Temple cancer center, plaintiff was forced to conceal figures that had been intentionally inflated by other Salick employees in an effort to mislead Temple with regard to the patient-load capacity of the projected center. After plaintiff disclosed this fraud to a Temple representative, plaintiff was discharged from her employment with Salick. In determining whether Salick was a "public body" under the Whistleblower Law, the *Cohen* court noted:

The language and legislative history of the Whistleblower Law demonstrate the legislature's intent to limit application of the statute to bodies "funded in any amount by or through the Commonwealth or political subdivision authority or a member or employee of that body". [sic] It is clear that the legislative intent was to make the law applicable to bodies that receive even one dollar of state funding. **However, there is no mention in the legislative history as to what is meant by "funding."**

*Id.* at 1525–26 (emphasis added).

In ultimately determining that Salick's receipt of reimbursements for services provided to individuals under the state Medicaid program did not bring it within the definition of a "public body," the court elaborated on the statutory intent of the word "funding:"

**The language "funded in any amount by or through the Commonwealth or political subdivision authority or a member or employee of that body" was intended by the legislature to be limited to monies which were appropriated by the legislature for the purpose of aiding "public bodies" in pursuit of their public goals.** This language was obviously not intended to make an individual or corporation a "public body" solely on the basis that monies were received by it from the state as reimbursement for services rendered. [W]hen construed as a whole, "the Whistleblower Law protects from retaliation public employees who make a good faith report about an instance of wrongdoing or waste to an employer or appropriate authority." (citation omitted).

*Cohen,* 772 F.Supp. at 1527 (emphasis added).

Further recognizing the statutory intent to limit application of the Law, the *Cohen* court stated that to extend the term public body to encompass entities receiving Medicaid reimbursements would potentially bring "every hospital, nursing home, institution for the mentally retarded, institution for the mentally ill, home health care provider, physician, chiropractor, podiatrist, ambulance company, dentist, and optometrist" within the letter of the Law. *Id.* at 1526. Such a result would be absurd where these health care providers were not the intended beneficiaries of the Medicaid program. *Id.*

Presently, the majority of states have passed their own whistleblowing laws in order to encourage the reporting of wrongdoing by employers. *See* Joan Corbo, *Kraus v. New Rochelle Hosp. Medical Ctr.: Are Whistleblowers Finally Getting the Protection They Need?,* 12 Hofstra Lab.L.J. 141, 157 (1994). Each state, however, tailors its own statute to afford a differing level of employee protection. Some states have limited the application of whistleblower laws by restricting an employee's report of an unlawful act to only those instances where there is an **actual** violation of a law or regulation. N.Y. C.L.S. Labor § 740(2) (1997). On the other hand, certain states have made it much easier for employees to state a viable claim where the employee's report is based upon a **reasonable good faith belief** that a violation has occurred, Cal.Lab.Code § 1102.5 (1996); N.J.S.A. § 34:19–1; 34:19–3, or even a **suspected belief** that a law was violated. Conn. Gen.Stat.Ann. § 31–51m; 26 M.R.S.A. §§ 831–840. Currently, at least thirty-five state legislatures have passed whistleblower statutes; while most of these statutes protect employees of state government and more than one-half of the states have laws extending to local government employees, approximately sixteen of these states bestow whistleblowing protection upon private sector employees. Lois A. Lofgren, *Whistleblower Protection: Should Legislatures and the Courts Provide a Shelter to Public and Private Sector Employees Who Disclose the Wrongdoing of an Employer?,* 38 **S.D.L.Rev.** 316, 321 (1993).

Consistent with the fact that legislatures have embodied differing whistleblowing policies and protections within their respective state laws, had our legislature intended to impede upon private employer-employee relations, it would have enacted a statute that would apply to whistleblowing in the private employment sector. In fact, this exact type of law presently exists in a number of our sister jurisdictions. *See* Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19–1–8 (New Jersey statute that specifically includes private as well as public employers from retaliating against employees for whistleblowing); N.Y. C.L.S. Labor § 740(2) (1997) (prohibits private employer from taking any retaliatory personnel action against a private employee for disclosing an employer's actual violation of a law, rule or regulation; the violation must present a substantial and specific danger to the public health and safety); Ohio Rev.Code Ann. 4113.51 (private sector whistleblowers are protected when they report felonies or other criminal offenses which create a public safety or health hazard, or are likely to cause imminent risk of physical harm); Mich.Comp. Laws Ann. § 15.362 (prohibits employers from retaliation against private sector employees who report a violation of a federal, state or local statute).

If we were to find that MCP is a public body, and, therefore, subject to the provisions of the Whistleblower Law, we would be setting a dangerous precedent in the area of employer-employee litigation—an area that has been carefully proscribed in both our Commonwealth's jurisprudence and statutory law. As the *Cohen* court found it necessary to deny protection under the Law to an employee who asserted that her private employer committed a violation affecting public interest, I also recognize that we must apply the legislative limitations of the Law to the present case.

In its response to plaintiff's second set of interrogatories, MCP answered:

Defendant objects to this interrogatory as vague and ambiguous to the extent it refers to the "Medical College Hospital of Pennsylvania," and objects to the interrog-

atory as overbroad, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information relating to federal or local financing or funding. Subject to the foregoing objections and the general objections, Defendant states that by the conclusion of each fiscal year, it received appropriations from the Commonwealth of Pennsylvania. **It is impossible for the Defendant to trace that appropriation directly or indirectly to the Neurology Department or the Mid Atlantic Regional Epilepsy Center, and consequently Defendant does not believe they directly or indirectly receive any benefit from such financing or funding.**

Unless an employee such as Dr. Riggio can show with clear and convincing evidence that his or her employer is funded by Commonwealth or political subdivision authority in order to specifically pursue public goals, *Cohen, supra,* I do not believe that employer is a "public body" under our state whistleblower law. Otherwise, virtually every organization, university, hospital, college, or similar entity that receives any type of non-reimbursement monies from the Commonwealth (whether termed appropriations, donations, grants, or even state income tax breaks) would be subject to potential liability under the statute. Reading the statute so literally, as appellant would have this court do, is to purposely advocate an absurd result in the law. 1 Pa.C.S. § 1922 (we assume the legislature never intended an absurd result).

It is Riggio's burden, as the non-moving party, to adduce sufficient evidence on the issue of whether MCP is a "public body," and therefore potentially subject to the whistleblower law. *See Watson v. City of Philadelphia,* 162 Pa.Commw. 340, 638 A.2d 489 (1994) (it was employee's initial burden to prove element of wrongdoing for action based on violation of Whistleblower Law; burden then shifted to employer to establish legitimate reason for adverse action). Based upon my interpretation of the statute and the record, this burden was not met.

CAVANAUGH, Judge, concurring:

I join in every respect with the majority disposition by Judge Hudock. I write separately only to point out what I consider a necessary consequence of the procedural posture in which this case is presented before our court en banc. It is, of course, basic to our en banc procedures that an appeal en banc is, in fact, a *de novo* appeal which considers all of the issues raised by appellant or cross-appellant. In this case, en banc review was sought solely on the issue of the application of the Pennsylvania Whistleblower Law and the majority opinion properly has limited its consideration to that issue. By so doing, appellant has abandoned or waived any present or future consideration of other issues initially raised in this appeal which were some five in number.

McEWEN, President Judge, concurring and dissenting:

While the author of the majority Opinion has proceeded to a sound and persuasive expression of views, I am, nonetheless, compelled to this expression since, while I agree that the Medical College of Pennsylvania is a *public body* for purposes of the Whistleblower Law, I am unable to agree that we can decide, on motion for summary judgment, whether appellees violated any statute, ordinance, regulation, code of conduct or ethical consideration designed to protect the interest of the public. I would, therefore, remand the case to the trial court so as to enable appellant to present evidence in support of her claim of such violations.